Filed 2/11/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re BROOKS LOVETON et al.<br><br>on Habeas Corpus. | A142096<br><br>(Contra Costa County Super. Ct.<br>Nos. 5-140055-5, 5-140056-3,<br>5-140057-1, 1-152851-2, 1-162831-2<br>1-160439-6, 5-122098-7, 2-314280-9) |

This case involves the transfer of defendants who have been found mentally incompetent to stand trial (IST) to the Department of State Hospitals (DSH or Department) for treatment. Penal Code section 1370[1] sets forth the required procedure for making this transfer. Here, the Contra Costa County Public Defender represented six IST defendants (collectively petitioners) in a consolidated action arising from individual petitions for writ of habeas corpus (writ petitions), in which petitioners requested that the trial court order DSH to admit IST defendants from Contra Costa County to DSH-Napa within four weeks after a trial court makes an order of commitment. The trial court ultimately granted relief, but ordered that such admissions must take place within 60 days, not four weeks, of the commitment order.

DSH now appeals from the trial court's standing order, contending the order (1) is inconsistent with section 1370; (2) undermines DSH's ability to carry out its statutory duties under section 1370, causing disruption and public harm, and subjecting DSH to potential equal protection and due process claims; and (3) circumvents established habeas

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

procedures.  Petitioners, again represented by the Contra Costa County Public Defender, cross-appeal from the order, arguing that the trial court should have ordered a time limit of 30 days, not 60 days, between the trial court's commitment order and DSH-Napa's admission of IST defendants.

During the pendency of this appeal, the Legislature made statutory changes related to the placement of IST defendants.  Because we conclude those changes do not materially affect the applicability of the standing order in the particular circumstances of this case, we shall affirm the order and remand the matter to the trial court with directions to modify the order as necessary to conform to the new statutory provisions.

**BACKGROUND**

*Statutory Background*

A person cannot be tried or sentenced while mentally incompetent.  (§ 1367, subd. (a).)  A defendant is deemed mentally incompetent "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (*Ibid.*)  Pursuant to section 1368, if, at any time prior to judgment in a criminal action, a doubt arises as to the defendant's mental competence, the court shall order a hearing to determine the defendant's competence.  (§ 1368.)  If, after a hearing, the defendant is found mentally competent, the criminal process shall resume.  (§ 1370, subd. (a)(1)(A).)

If, however, the defendant is found IST, the criminal process shall be suspended until the defendant becomes mentally competent.  (§ 1370, subd. (a)(1)(B).)  "In the meantime, the court shall order that the mentally incompetent defendant be delivered by the sheriff to a state hospital . . . as directed by the State Department of State Hospitals," or to an approved and available treatment facility "that will promote the defendant's speedy restoration to mental competence," unless the court orders the defendant placed on outpatient status.  (§ 1370, subd. (a)(1)(B)(i).)

When the court orders the defendant's commitment, it is required to provide a packet of documents (the 1370 packet) that, prior to admission of the defendant to DSH or another treatment facility, must include copies of the following:  the commitment

2

order, a computation of the defendant's maximum term of commitment, a computation of the amount of credit for time served, criminal history information, arrest reports, court-ordered psychiatric examination or evaluation reports, a placement recommendation report, records of any finding of mental incompetence arising out of a charge of an offense specified in section 290, and medical records. (§ 1370, subd. (a)(3).)

After the defendant has been admitted to a state hospital, an interim report on his or her restoration to competence is required: "Within 90 days of a commitment made pursuant to subdivision (a), the medical director of the state hospital or other treatment facility to which the defendant is confined shall make a written report to the court and the community program director for the county or region of commitment, or a designee, concerning the defendant's progress toward recovery of mental competence . . . ." (§ 1370, subd. (b)(1).)

After the trial court issued its standing order in this case, Assembly Bill No. 1468, a budget bill related to public safety, amended section 1370 and related statutes in ways that potentially affect the timing of IST defendants' transfers to a state hospital. (Stats. 2014, ch. 26 (2014-2014 Reg. Sess.), § 25, eff. June 20, 2014.)[2] Under former section 1370, the trial court chose the state hospital to which an IST defendant would be committed. (Former § 1370, subd. (a)(5).) Under the new version of section 1370, the

_____

[2] The Legislative Counsel's Digest summarized the proposed amendments to section 1370: "This bill would repeal the provision requiring the court to select the state hospital in accordance with the policies established by [DSH] when directing that the defendant be confined in a state hospital. The bill would instead require, prior to admission to [DSH], [DSH] to evaluate each patient committed pursuant to specified provisions of law to determine the placement of the patient to the appropriate state hospital. The bill would also require a court that orders that a defendant be committed to [DSH] or other public or private treatment facility to provide copies of any medical records with the [1370 packet] prior to admission of the defendant to [DSH] or other treatment facility where the defendant is to be committed. The bill would require the department to utilize specified documents, including those described [in former section 1370, subdivision (a)(3] and any medical records, to make the appropriate placement. . . ." (Legis. Counsel's Dig., Assem. Bill No. 1468, Stats. 2014, ch. 26.)

We shall discuss the effect of these statutory amendments on the present case in part VI., *post*.

3

court commits the defendant to DSH, which then selects the state hospital to which the IST defendant is to be admitted. (§ 1370, subd. (a)(5).) Under amended Welfare and Institutions Code section 7228, prior to admission, DSH "shall evaluate each patient committed pursuant to [section 1370] to determine the placement of the patient to the appropriate state hospital," utilizing the documents provided pursuant to section 1370, subdivision (b), to make the appropriate placement. In addition, amended section 1370, subdivision (a)(3), now requires that the 1370 packet be sent to DSH *prior to* the IST defendant's admission, rather than with the defendant. (Compare former § 1370, subd. (a)(3).) The packet now must also include the defendant's medical records. (§ 1370, subd. (a)(3)(I).)[3]

### *Factual and Procedural Background*

In October, November, and December, 2013, the trial court issued a series of orders to show cause based on DSH's alleged failure to admit petitioners—all of whom are IST defendants—to a state hospital in a timely manner, pursuant to section 1370.

---

[3] Other more recent and pending amendments to section 1370 do not directly affect our resolution of the issues raised in this appeal. (See Stats. 2014, ch. 733 (Assem. Bill No. 2186), § 1, eff. Jan 1. 2015 [changes related to involuntary administration of antipsychotic drugs]; Stats. 2014, ch. 742 (Assem. Bill No. 2626), § 1, eff. Jan. 1, 2015 [if 90-day report indicates no substantial likelihood that IST defendant will regain mental competence in foreseeable future, committing court must order defendant to be returned to court no later than 10 days following receipt of report]; Stats. 2014, ch. 759 (Sen. Bill No. 1412), § 7.3, eff. Jan. 1, 2015 [related to incompetent defendants on probation, mandatory supervision, postrelease community supervision, or parole; involuntary administration of medication; and defendants who have no substantial likelihood of regaining mental competence in foreseeable future]; Stats. 2015, ch. 26 (Sen. Bill No. 85), § 30, eff. June 24, 2015 [regarding fiscal and other responsibilities of DSH and county where county jail is used as a treatment facility for IST defendants, and new responsibilities for DSH related to pilot enhanced treatment programs for mentally disordered persons ]; Stats. 2015, ch. 260 (Sen. Bill No. 453), § 1, eff. Jan. 1, 2016 [related to psychiatrist's examination of patients for purposes of seeking involuntary medication]; see also Assem. Bill No. 112 (2015-2016 Reg. Sess.), June 17, 2015 [regarding proposed addition of section 1370.6, related to reimbursement by DSH for IST defendants treated at county jails or community-based treatment facilities].)

The six petitioners include Brooks Loveton, who was found incompetent to stand trial on July 30, 2013, and was committed to DSH on November 6, 2013. On December 11, 2013, the trial court issued an order to show cause (OSC) to DSH-Napa for failing to admit Loveton, who was ultimately admitted to DSH-Napa on January 21, 2014, 75 days after the date of commitment.

William Smith was found incompetent to stand trial on August 20, 2013, and was committed to DSH on September 26, 2013. On October 23, 2013, the trial court issued and OSC to DSH-Napa for failing to admit Smith, who was admitted to DSH-Atascadero on November 26, 2013, 61 days after commitment.

Victor Calderon was found incompetent to stand trial on August 27, 2013, and was committed to DSH on September 24, 2013. On October 28, 2013, the trial court issued an OSC to DSH-Napa for failing to admit Calderon, who was admitted to DSH-Napa on December 19, 2013, 85 days after commitment.

Asia Isola was found incompetent to stand trial on December 11, 2012, and was committed to DSH on October 8, 2013. On November 5, 2013, the trial court issued an OSC to DSH-Napa for failing to admit Isola, who was admitted to DSH-Napa on or about December 24, 2013, some 77 days after commitment.

Lawrence Payton was found incompetent to stand trial on September 3, 2013, and was committed to DSH on October 1, 2013. On November 5, 2013, the trial court issued an OSC to DSH-Napa for failing to admit Payton, who was admitted to DSH-Napa on or about December 12, 2013, approximately 72 days after commitment.

Jose Navarro was found incompetent to stand trial on November 19, 2013, and was committed to DSH on December 17, 2013. Navarro was admitted to DSH-Napa on March 12, 2014, 86 days after commitment.

On January 9, 2014, Loveton, Calderon, and Smith filed separate writ petitions, requesting that the court direct the Contra Costa County sheriff to immediately transfer them to an appropriate mental health facility or release them from custody. On February 25, 2014, Loveton, Calderon, and Smith filed a supplemental writ petition, requesting a prospective order requiring that all defendants in Contra Costa County committed to the

5

state hospital pursuant to section 1370, to be transported to the hospital no more than four weeks from the date of commitment. The court subsequently deemed Isola, Navarro, and Payton to be intervening parties in the action.

Two witnesses testified during the first day of evidentiary hearings, on January 10, 2014, regarding then-current admissions procedures for IST defendants at DSH-Napa.[4] Diane Mond, a registered nurse who supervised admission of IST defendants, testified that DSH-Napa screens patients from 39 counties in California, including Contra Costa County. Because it is a hospital for low to medium security risk patients, it pre-screens patients before commitment for escape risk, using a pre-screening packet provided by Contra Costa County's Conditional Release Program (CONREP). After screening for escape risk, DSH-Napa makes a recommendation to CONREP regarding placement. CONREP then submits DSH-Napa's recommendation to the trial court, and the trial court commits the patient to one of DSH's four hospitals: DSH-Napa, DSH-Atascadero, DSH-Metropolitan, or DSH-Patton.

If the patient is committed to DSH-Napa, the hospital receives the 1370 packet from the court, which should contain a commitment order; a list of the pending charges, maximum term of commitment, and time served; a summary of the patient's criminal history; arrest reports; psychiatric examination reports; and the CONREP placement recommendation report. Medical treatment information is also required, and must be received either as part of the 1370 packet or before the packet arrives.[5] After the packet is checked for completeness and accuracy, it is passed on to the admissions suite.

DSH-Napa is statutorily precluded from having more than 980 patients—including both IST defendants and other patients—in its secured treatment area. (See Welf. & Inst. Code, § 7200.06.) The hospital generally has an IST waiting list of about one hundred

---

[4] The evidentiary hearing in this case took place before section 1370's amendment, as discussed, in part I. of the Background, *ante*.

[5] During the second day of the evidentiary hearing, on March 14, 2014, Mond testified that DSH-Napa also requests current medical information right before the patient is admitted, to ensure a continuum of care.

patients, and can only admit new patients as current patients are discharged back to the county as competent. Only about 7 to 10 beds a week open up for new patients, so patients are waiting over 60 days from receipt of the 1370 packet for a bed. Patients are placed on the waiting list based on when their packets are complete. In addition, several counties have placed deadlines requiring that a patient be admitted by a certain date. At the time of the hearing, DSH-Napa was unable to meet those deadlines. However, patients from counties with standing orders are moved to the top of the admission list.

Dr. Patricia Tyler, chief psychiatrist and medical director at DSH-Napa, testified that, while bed capacity at the hospital has not increased at all in recent years, the number of patients admitted as IST defendants has increased. In 2011, DSH-Napa admitted 391 IST defendants; in 2012, it admitted 491 IST defendants; and, in 2013, she expected admission of 527 IST defendants. In an effort to reduce the wait time for new patients, DSH-Napa had developed a process for screening people upon their arrival at the hospital to determine how close to competency they are, whether language or cognitive problems are involved, and whether they are malingering. It also has a specialized group of psychiatrists and psychologists who are skilled at identifying malingers who write the 90-day interim reports that are required under section 1370. Over a two-year period, with these and other changes, DSH-Napa had been able to decrease the average length of stay from 180 days to 60 days.

Dr. Tyler explained that receipt of a patient's medical records is required for a 1370 packet to be considered complete, under the hospital's accrediting standards, federal regulations, and community standards. The reason for this requirement is that the receiving facility needs to prearrange any required medical interventions, such as cancer medication or dialysis, to ensure continuity of care and patient safety.

Dr. Tyler believed that psychiatric treatment in the jails, which generally consists of medication and monthly checkups only, is often inadequate to meet IST patients' needs. At DSH-Napa, patients receive the individualized treatment that they need. They also have recreational groups, which, while not necessary to be restored to mental competency, are necessary to provide quality of life.

At the time of the hearing, the time between IST defendants' commitment date or completion of the 1370 packet and the date of admission was approximately four months for women and 60 days for men. The wait time for IST defendants from Sacramento was shorter.

At the continued evidentiary hearing, which took place on March 14, 2014, Diane Mond, recalled as a witness, testified about waitlists at the state hospitals. Occasionally, IST defendants who have been outpatients have to be placed at DSH-Napa on an emergency basis, in which case, they have priority over people on the waitlist. Also, DSH-Napa refers patients on the waitlist to other state hospitals when those hospitals have beds available. For example, Mond had just learned that DSH-Atascadero had 10 beds available. This was the first time in a year and a half that DSH-Atascadero was able to take patients from DSH-Napa's waitlist. Currently, Patton had a waitlist of "a couple of hundred." Mond did not know the exact waitlist numbers for Metropolitan; it had "some" wait time for females, but a shorter waitlist for males than DSH-Napa. The current waitlist at DSH-Napa for patients with complete packets included about 80 males and about 16 females. Wait time to DSH-Napa varied from county to county and even within a county, with patients with OSCs gaining admission sooner.[6] In its IST program, DSH-Napa had dedicated units with 230 IST beds allocated for males and 20 beds allocated for females.[7]

Additional testimony at the March 14, 2014 hearing included that of Martinez Superior Court Manager Shelley Hasson, who testified that the court sends 1370 packets to DSH-Napa within 48 hours of receipt of the order to prepare the packet. The packets

---

[6] For example petitioner Navarro's wait time from the date DSH-Napa received the admission packet to his admission was about 35 days. Because of the OSC that had issued as to Navarro, the hospital skipped over about 50 other referrals of IST defendants who had been waiting longer for a bed.

[7] After oral argument, at our request, DSH's counsel submitted a letter explaining that, currently, of the 980 beds in DSH-Napa's secured treatment area, 320 beds are allocated to patients admitted under section 1370, including 230 beds for men and 90 beds for women. Most of the remaining beds are reserved for patients admitted pursuant to sections 1026 and 2972.

include the charging document, police and probation reports, a doctor's report, and the court's order.

Jennifer Brush, a forensic services manager at DSH-Atascadero, testified that DSH-Atascadero considers a 1370 packet complete, for purposes of placement on an admissions list, when it includes the documents required by section 1370, subdivision (a)(3). DSH-Atascadero requests medical information also, but does not require it before putting a patient on a list. At the time of the hearing, DSH-Atascadero did not have a waitlist, and tried to get IST defendants admitted within 30 days of commitment, as long as it had a complete packet for them.

Daphne Wakefield, a former administrative specialist with CONREP, testified that CONREP receives the 1370 packet within about three days of receipt of the court's referral of an IST defendant. CONREP then scans the packet, which consists of alienist reports, rap sheets, and criminal history, and emails it to DSH-Napa.

On April 28, 2014, the trial court ruled on the habeas petition. In an extremely thorough and well-reasoned statement of decision, the court first found that all of the petitioners had now been admitted to DSH-Napa, which meant that their cases were moot. The court nonetheless determined that it was appropriate to address the issues raised because "the petition poses an issue of important public interest concerning the delay in psychiatric treatment to persons found incompetent to stand trial that is likely to reoccur in view of the consistent delay in admissions of such persons to DSH-Napa from the time of their commitment pursuant to [section] 1370." In addition, given DSH-Napa's rapid response to the courts OSCs, the court believed that IST defendants "are delivered and admitted to DSH-Napa within a short period of time after such an order issues. Because of this, the issue may evade review." Finally, the court further found that "a writ of habeas corpus is an appropriate procedure for resolving the present case since it may serve as a means of obtaining a declaration of the petitioners' rights and the rights of others similarly situated. [Citation.]"

The court found that "subjecting the petitioners to prolonged detention in the county jail without any evidence they received treatment to restore their competency"

9

violated their due process rights. The court then balanced the petitioners' liberty interests against DSH-Napa's interests, noting that it could not "ignore the increasing number of defendants found IST that are being committed to Napa and the lack of a commensurate increase in available beds," as well as the actions DSH-Napa had taken "to improve coordination of the IST population with the goal of reducing the wait list."[8]

The court concluded: "Because of the remedial efforts made by [Napa] including reducing the wait time to get into the hospital and their length of stay [citation] coupled with the fact that [Napa] has demonstrated it is capable within 17 to 21 days of admission of producing a meaningful report and that within such time a defendant can be duly evaluated and derive some benefit from the prescribed treatment, the court is satisfied that a 60-day time limit strikes a balance between a defendant's right to not be unduly confined without efforts being made to restore his or her competency and [Napa's] interest in providing uniform treatment to all 39 counties [within its treatment area] including Contra Costa County." The court further observed that a time limit of 60 days from the date of commitment for admitting IST defendants gave DSH-Napa "an average period of 30 days within which to complete and produce the 90-day report in compliance with [section] 1370."

---

[8] The court rejected petitioners' argument that their equal protection rights were violated by DSH-Napa giving preferential treatment to IST defendants from certain other counties. The court found that counties with court-ordered deadlines *did* get preferential treatment, but further found that "the differential treatment toward Sacramento and Yolo counties is not the result of any intentional or purposeful discrimination *on the part of DSH-Napa*. Rather in each of the above cases cited, DSH-Napa is subject to a lawful court order *directing DSH-Napa* to admit patients from the named counties by a certain time. This treatment reflects a non-arbitrary basis for enforcement of the statute. . . . [¶] Accordingly, it is not DSH-Napa that is singling out certain individuals for preferential treatment[;] rather it is the courts' orders mandating the hospital's compliance with the deadline set in that order that creates the lack of uniformity in the treatment of such patients. Such compliance with the court orders does not equate with invidious discrimination nor does it represent any independent act on the part of DSH-Napa to purposefully discriminate against Contra Costa County."

The court therefore ordered: "DSH-Napa shall accept any defendant in the custody of the Sheriff of Contra Costa County ordered by the court to be placed in DSH-Napa, pursuant to [section] 1370, [subdivision] (a)(5), within not more than 60 calendar days of the court's order of commitment provided the defendant's complete information packet has been received by the hospital within five court days of the commitment order. If the defendant's complete intake package, pursuant to [section] 1370, has not been received by DSH-Napa within a timely manner, DSH-Napa may, if necessary, request an extension for filing the 90-day evaluation report commensurate with the circumstances of the case. [¶] . . . [¶] DSH-Napa may also deny admission to a defendant if his or her health information as specified by DSH-Napa is not received by the hospital."

On June 3, 2014, DSH filed a notice of appeal. On June 19, 2014, all petitioners filed a notice of cross appeal. On October 3, 2014, we issued a temporary stay of the trial court's April 28, 2014 order and, on November 24, 2015, we granted DSH's petition for writ of supersedeas pending resolution of this appeal.[9]

## DISCUSSION

### I. *The Law Relating to IST Defendants*

In *Jackson v. Indiana* (1972) 406 U.S. 715, 738 (*Jackson*), the United States Supreme Court held "that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant

---

[9] The parties note that standing orders from three other counties have recently been challenged on appeal. Those appeals have now been decided, in one published and two unpublished opinions. (See *People v. Brewer* (2015) 235 Cal.App.4th 122 (*Brewer*) [Sacramento County]; *People v. Yanez* (Apr. 3, 2015, C075863 [Yolo County]); *People v. Delato* (Oct. 23, 2015, C075940) [San Joaquin County].)

probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal. In light of differing state facilities and procedures and a lack of evidence in this record, we do not think it appropriate for us to attempt to prescribe arbitrary time limits." (Fn. omitted.)

The following year, the California Supreme Court addressed the constitutionality of the procedures set forth in section 1367 et seq. related to IST defendants' commitment to and release from state hospitals. (*In re Davis* (1973) 8 Cal.3d 798, 801 (*Davis*).) The court concluded that, although the initial commitments of the petitioners in that case were proper, "some provision must be made to assure that petitioners do not face an indefinite commitment without regard to the likelihood that they will eventually regain their competence, for such an indefinite commitment has been held to offend constitutional principles of equal protection and due process." (*Ibid.*, citing *Jackson*, *supra*, 406 U.S. 715.) The court therefore "adopt[ed] the rule of the *Jackson* case that no person charged with a criminal offense and committed to state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future. Unless such a showing of probable recovery is made within this period, defendant must either be released or recommitted under alternative commitment procedures." (*Davis*, at p. 801.)[10]

Subsequently, in *In re Mille* (2010) 182 Cal.App.4th 635, 638 (*Mille*), Division Three of the Second District Court of Appeal granted the habeas petition of an IST defendant who was challenging an 84-day delay in his transfer from the county jail to the

---

[10] Following *Davis*, section 1370 was amended to provide, for the first time, a maximum period of confinement for IST defendants. (Stats. 1974, ch. 1511, § 6, p. 3319.) Subdivision (c)(1) of section 1370 now provides: "At the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment provided by law for the most serious offense charged . . . , whichever is shorter, but no later than 90 days prior to the expiration of the defendant's term of commitment, a defendant who has not recovered mental competence shall be returned to the committing court" for further proceedings.

state hospital, after the trial court ordered him transported to DSH-Patton for evaluation and treatment. The *Mille* court rejected DSH's argument that the defendant's treatment at the county jail with antipsychotic medication during the delay was an adequate substitute for timely transfer to the state hospital. (*Id.* at pp. 644-645.) The court focused on section 1370's requirement that, within 90 days of commitment, the medical director of the state hospital must report to the court on the defendant's progress toward recovery of mental competence. (§ 1370, subd. (b)(1).) As the court explained, "[w]hen, a defendant arrives at [the state hospital] on day 84 of the 90-day period, there is no meaningful opportunity for the defendant to make progress toward recovery of mental competence, let alone for the medical director of the hospital to make a written report to the court concerning such progress by the defendant." (*Mille*, at p. 645.)

The court in *Mille* then addressed the rule, set forth in *Jackson* and *Davis*, that an IST defendant "*cannot be held more than the reasonable period of time* necessary to determine whether there is a substantial probability that he will attain [mental competence] in the foreseeable future." (*Jackson*, *supra*, 406 U.S. at p. 738, italics added; accord, *Davis*, *supra*, 8 Cal.3d at p. 801.) The *Mille* court stated: "What constitutes a reasonable length of time will vary with the context. Here, the discrete issue is what constitutes a reasonable time to effectuate a transfer from the county jail to a state mental hospital for evaluation and treatment, in light of the requirement that the hospital report back to the court within 90 days concerning the defendant's progress toward recovery of mental competence. (§ 1370, subd. (b)(1).)

" '[W]e do not think it appropriate for us to attempt to prescribe arbitrary time limits' (*Jackson*, *supra*, 406 U.S. at p. 738) for a defendant who is mentally incompetent to stand trial to be transported to a state mental hospital for treatment. However, the statutory scheme requires that within 90 days of the order committing a defendant to a state mental hospital for treatment, the defendant must be delivered to the hospital, the hospital must examine the defendant and provide the defendant with treatment that will promote speedy restoration to competence, and the hospital's medical director must document the defendant's progress in a report to the court. (§ 1370.) For all of this to

13

occur, a defendant needs sufficient time at the state mental hospital to be duly evaluated, potentially to derive some benefit from the prescribed treatment, and for such progress to be reported to the court. [¶] Clearly, to implement section 1370, a defendant must arrive at [the state hospital] timely, not on the 84th day following the commitment order." (*Mille*, *supra*, 182 Cal.App.4th at pp. 649-650.)

The *Mille* court thus concluded: "[W]hen the court orders a defendant committed to a state mental hospital for treatment that will promote a defendant's 'speedy restoration to mental competence' (§ 1370, subd. (a)(1)(B)(i)), the court must also ensure that the defendant is actually transferred to the state hospital within a reasonable period of time." (*Mille*, *supra*, 182 Cal.App.4th at p. 650.) The court held, in the circumstances of that case, that the trial court should have granted the defendant's initial habeas petition, filed 30 days after the commitment order had issued. (*Ibid.*)

Recently, in *Brewer*, *supra*, 235 Cal.App.4th 122, the Third District Court of Appeal addressed the validity of a standing order from Sacramento County that is quite similar to the one challenged in this case.[11] In *Brewer*, the original 2006 order (known as the Osburn order) required that IST defendants be transferred to DSH-Napa within seven days of the order of commitment. (*Id.* at p. 133.)[12] Then, in 2013, the trial court denied DSH's motion to set aside the Osburn order, but modified the order to extend the seven-day deadline for transfer to a state hospital to 14 days. (*Id.* at p. 134.) DSH appealed the trial court's order. (*Id.* at p. 135.)

---

[11] The parties have submitted supplemental briefing regarding the effect, if any, of *Brewer* on the issues raised on appeal.

[12] The trial court in *Brewer* had found persuasive the Ninth Circuit Court of Appeals' opinion in *Oregon Advocacy Center v. Mink* (9th Cir. 2003) 322 F.3d 1101, 1121-1122 (*Mink*), which held that the Oregon State Hospital violated the due process rights of IST defendants when it refused to admit them in a timely manner. The *Mink* court upheld the district court's injunction requiring the state hospital to admit IST defendants within seven days of a judicial finding of incompetence. (*Id.* at p. 1123.) The *Mink* court noted that the district court had "set the time limit at seven days based in part on the Oregon legislature's choice of that time limit in the now-superseded version of the relevant state statute. See ORS § 161.370(3) (1999)." (*Mink*, at p. 1122, fn. 13.)

14

On appeal, a majority of the court rejected several of DSH's contentions challenging the trial court's authority to issue the Osburn order, including its claim that the trial court lacked fundamental jurisdiction to impose any transfer deadline. As the court explained: "In setting a deadline for transfer, a court is *not* rewriting or adding to the statute. Instead, the court is enforcing the statutory imperative for a meaningful progress report within 90 days of the commitment order. . . . A court acts within its constitutional core function and does not violate the separation of powers doctrine when it interprets and applies existing laws and carries out the legislative purpose of statutes. [Citation.] That is all the transfer deadline does." (*Brewer*, *supra*, 235 Cal.App.4th at p. 137.)

The appellate court also rejected DSH's claim that the order obviated established habeas procedures by granting relief beyond the claims of the petitioners, which were now moot. The court observed that, " '[i]rrespective of mootness, a habeas corpus petition is "an acceptable vehicle for a general declaration of the procedural rights of individuals detained" involving an issue of general public concern, particularly if it pertains to the administration of criminal justice. [Citation.]' [Citation.]" (*Brewer*, *supra*, 235 Cal.App.4th at p. 138.) The court further rejected DSH's claim that the order was an improperly promulgated local rule, finding, instead, that it was an injunction. (*Ibid.*) Finally, given that DSH had not appealed from the original Osburn order, but only from its 2013 modification, the court found that DSH had forfeited its contention that the trial court had acted in excess of its jurisdiction by making an order that applied to all IST defendants, rather than to specific defendants individually. (*Id.* at p. 137.)

The *Brewer* court then addressed DSH's contention that changes in the law required that the Osburn order be set aside. The court first rejected the argument that the 14-day deadline contradicted the "reasonable period of time" standard set forth in *Mille*, stating that "[t]he *Mille* court was concerned with the period of time within which the defendant must be evaluated while at the state hospital, not the time DSH needed to secure his admission thereto." (*Brewer*, *supra*, 235 Cal.App.4th at p. 139.) The court did, however, conclude that the 2014 amendments to section 1370, made after the trial

15

court had modified the Osburn order, constituted a material change in the law. (*Brewer*, at p. 142.)[13]

The court in *Brewer* rejected the petitioners' suggestion that the court could merely modify the order to conform to the new statutory scheme, concluding that Assembly Bill No. 1468 constituted a material change in the law, which "may have a greater effect on the Osburn [o]rder than simply the changes discussed *ante*. These changes in the law may also affect the reasonableness of a mandatory 14-day deadline for transfer to the state hospital after the commitment order. The Department now has additional duties to perform before admission of a defendant to a state hospital, including selecting the most appropriate hospital or treatment facility for restorative treatment after review of the 1370 packet and other documents. Compilation of the section 1370 packet may take additional time as it now must include the defendant's medical records. . . . The trial court must carefully consider whether the 14-day deadline is reasonable in light of these additional duties.

"Indeed given the additional individualized assessment now required after the Department receives the 1370 packet, the trial court must determine not only whether a short 14-day deadline from the date of the commitment order is reasonable, but also whether *any* deadline should be triggered by the commitment order or by the Department's receipt of the 1370 packet. The trial court must hold a new evidentiary hearing to ascertain how much time is reasonable, after the 1370 packet is prepared and sent to the Department, to accommodate both the Department's duties prior to delivering IST defendants to the designated hospital or other treatment facility and the statutory requirement of a progress report from such hospital or facility within 90 days of commitment. (§ 1370, subd. (b)(1).)" (*Brewer*, *supra*, 235 Cal.App.4th at p. 142.) The

---

[13] As discussed earlier in this opinion, the trial court now commits each IST defendant to DSH, not to a specific hospital, and DSH evaluates the defendant to determine the appropriate placement. (§ 1370, subd. (a)(5); see also Welf. & Inst. Code, § 7228.) In addition, the 1370 packet must include the defendant's medical records and must be sent to DSH prior to the defendant's admission. (§ 1370, subds. (a)(3) & (a)(3)(I).)

court therefore reversed the trial court's order denying the motion to set aside the Osburn order and remanded for reconsideration of the motion, in light of the amendments to section 1370. (*Brewer*, at p. 143.)[14]

In a concurring and dissenting opinion in *Brewer*, Justice Nicholson agreed that the injunction should be dissolved and the matter remanded to the trial court, but disagreed about what should be done on remand. (*Brewer*, *supra*, 235 Cal.App.4th at p. 143.) In his view, the law "requires the court to decide each defendant's petition for writ of habeas corpus on its own unique facts." (*Ibid.*) Justice Nicholson would find the Osburn order an abuse of discretion "because (1) it is unhinged from constitutional due process doctrine and inconsistent with precedent binding on the superior court, (2) it ignores the rights of IST defendants when the superior court fails to prepare the intake packet, and (3) it forces the Department to give defendants from Sacramento County, only one of 58 counties, preference when resources are limited." (*Id.* at p. 150.)

First, Justice Nicholson believed that "the reasonable period of time" an IST defendant may be held, as discussed in *Jackson*, *Davis*, and *Mille*, cannot be arbitrarily set by a court to apply to all IST defendants in a particular county. (*Brewer*, *supra*, 235 Cal.App.4th at p. 151.) In his view, the trial court and majority's assumption that every such case is substantially the same was "the type of uniform but arbitrary limit rejected in *Jackson*, *supra*, 406 U.S. at page 738." (*Brewer*, at p. 151.)

Second, Justice Nicholson believed that there was "a gaping hole in the [Osburn] order that potentially allows a defendant to languish in county jail long after any reasonable period of time to transfer the defendant to the Department has expired. That gaping hole is the exception that there is no duty to transfer an IST defendant unless the superior court gives the Department an intake packet . . . ." (*Brewer*, *supra*, 235 Cal.App.4th at pp. 152-153.) He similarly believed the order "impose[d] an impossible

---

[14] Given its disposition, the *Brewer* court declined to address DSH's contention that the Osburn order had exposed the Department to lawsuits from other IST defendants in other counties claiming a violation of equal protection. (*Brewer*, *supra*, 235 Cal.App.4th at p. 143.)

17

burden on the sheriff. . . . [¶] These are problems that may be susceptible to legislative resolution, applicable to all cases, but the superior court is not equipped to foresee all the eventualities and provide an all-inclusive remedy." (*Id.*. at p. 153.) Accordingly, "[t]he problem of failure to transfer any particular IST defendant to the Department within a reasonable period of time should be addressed in individual petitions for writ of habeas corpus," in which "the court can consider the specific needs of the defendant and the legislative requirement that the Department report back to the superior court within 90 days after commitment, as well as any other considerations that affect the due process rights of the defendant." (*Ibid.*)

Finally, Justice Nicholson noted that the Osburn order applied to only "a small fraction of statewide IST defendants." (*Brewer*, *supra*, 235 Cal.App.4th at p. 153.) Referring to evidence showing that IST defendants from counties without standing orders must wait longer for admission to a state hospital, he stated: "There is no rational or constitutional justification for affording Sacramento County's IST defendants preference over defendants from other counties. Indeed, the effect of doing so is to encourage other superior courts . . . to impose their own arbitrary orders on the beleaguered Department. Chaos ensues." (*Id.*. at p. 154.)

Justice Nicholson therefore concluded that "[t]he appropriate remedy for the general problem lies in the legislative and administrative processes of the state and its counties, not in the courts" since "any general remedy from the courts will be arbitrary and uneven." (*Brewer*, *supra*, 235 Cal.App.4th at p. 154.)

## II. *Standard of Review*

Although this matter arises from consolidated habeas petitions, the trial court granted injunctive relief and the appeal is from that permanent injunction. (See *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1160 ["an injunction may be more completely defined as a writ or order commanding a person either to perform or to refrain from performing a particular act"], quoted in *Brewer*, *supra*, 235 Cal.App.4th at p. 135 [finding that Osburn order was an injunction, and DSH's motion to set aside order was a motion to dissolve that injunction].) " 'The trial court's decision to grant a permanent

injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.'  [Citations.]  Notwithstanding its discretionary component, a permanent injunction must be supported by substantial evidence in the record.  [Citation.]  [¶] . . . .  [Moreover], when reviewing the interpretation and application of a statute where the ultimate facts are undisputed, we exercise our independent judgment to determine whether the injunction was proper.  [Citations.]" (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 964.)

In addition, "[i]t is an established rule of law that on appeal from a judgment granting or denying injunctive relief, the law to be applied is that which is current at the time of the appellate court opinion.  [Citation.]  ' "Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court." ' [Citation.]" (*Kidd v. State of California* (1998) 62 Cal.App.4th 386, 407; accord, *McKinny v. Oxford Union High School District Board of Trustees* (1982) 31 Cal.3d 79, 85, fn. 1.)

### III.  *Alleged Lack of Fundamental Jurisdiction*

DSH contends the trial court's order was inconsistent with section 1370 and violated the separation of powers doctrine because section 1370 does not contain any specific timeline for admission of IST defendants.

Contrary to DSH's contention, the Legislature *did* impose a deadline by mandating, pursuant to section 1370, subdivision (b)(1), that the medical director of the state hospital report on each IST defendant's progress toward recovery of competence within 90 days of commitment.  (See *Brewer*, *supra*, 235 Cal.App.4th at p. 137; *Mille*, *supra*, 182 Cal.App.4th at p. 648.)  The trial court in this case found that 60-days "constitutes a reasonable time to effectuate a transfer from the county jail to a state mental hospital for evaluation and treatment, in light of the requirement that the hospital report back to the court within 90 days concerning the defendant's progress toward recovery of mental competence.  (§ 1370, subd. (b)(1).)" (*Mille*, at p. 649.)

Based on the evidence in the record, the trial court reasoned that DSH-Napa was able to produce a 90-day report within 17 to 20 days after an IST defendant was admitted

19

to the hospital. The trial court then balanced the interests of IST defendants with those of DSH-Napa, and concluded that a reasonable period of time within which to transfer IST defendants to DSH-Napa, to ensure that the requirements of subdivision (b)(1) of section 1370 could be satisfied, was no more than 60 days from the date of commitment. (See *Brewer*, *supra*, 235 Cal.App.4th at p. 137 ["A court acts within its constitutional core function and does not violate the separation of powers doctrine when it interprets and applies existing laws and carries out the legislative purpose of statutes. [Citation.] That is all the transfer deadline does"]; cf. *Mille*, *supra*, 182 Cal.App.4th at p. 649.) The trial court thus did not improperly insert a transfer deadline into section 1370. Rather, in setting a 60-day deadline, the court established an "outer limit" of what constitutes a reasonable time for transfer of Contra Costa County IST defendants to DSH-Napa, in order to meet the statutory 90-day reporting deadline. (*Brewer*, at p. 137; *Mille*, at pp. 649-650; see also § 1370, subd. (b)(1).)

### IV. *Alleged Interference with DSH's Discretion*

DSH contends the trial court exceeded its jurisdiction and intruded on DSH-Napa's duty under section 1370 to conduct individualized assessments of IST defendants by issuing a blanket order imposing a 60-day deadline for admission of all Contra Costa County IST defendants. (See *Brewer*, *supra*, 235 Cal.App.4th at p. 136, quoting *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 661 [" ' " '[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction.' " [Citation]' "].)[15] We disagree.

The existence of a standing order does automatically undermine DSH's discretion. In crafting its order, the trial court examined several competing interests: Contra Costa County IST defendants' due process right to receive treatment within a reasonable period of time; the statutory requirements of section 1370, subdivision (b)(1); and DSH-Napa's

---

[15] The *Brewer* court declined to address a similar contention, finding that it had been forfeited by DSH's failure to appeal from the original Osburn order. (*Brewer*, *supra*, 235 Cal.App.4th at p. 137.) Here, DSH immediately appealed from the trial court's order and the issue is properly before us.

20

interest in providing uniform treatment to all 39 counties. The court then carefully balanced all of these interests, and found that 60 days was the outside limit for ensuring timely admission to DSH-Napa for Contra Costa County IST defendants. (See *Youngberg v. Romeo* (1982) 457 U.S. 307, 320 [in prior case, in determining that procedural due process did not require an adversarial hearing, Supreme Court "weighed the liberty interest of the individual against the legitimate interests of the State, including the fiscal and administrative burdens additional procedures would entail"], citing *Parham v. J.R.* (1979) 442 U.S. 584, 599-600.) [16] This deadline did not strip DSH of its discretion to evaluate the needs of individual IST defendants, whether from Contra Costa County or other counties. Instead, it placed an outer limit on the time after commitment when Contra Costa County defendants must, in accordance with their procedural due process rights and based on all of the circumstances, be admitted to DSH-Napa. (Cf. *Brown v. Plata* (2011) 563 U.S. 493 [131 S.Ct. 1910, 1928-1929] [explaining, in prison administration context, that courts "must not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners.' [Citation.] Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration"].)

DSH further argues that the standing order puts it "in the untenable position of either abiding by the standing order and risking legal actions for alleged violations of due process and equal protection rights of IST defendants in other counties, or risking contempt by violating the standing order in order to carry out its discretionary duties

---

[16] DSH observes that, in *Mille*, the appellate court did not hold that one particular time limit was applicable to all IST defendants, and asserts that the trial court in this case violated the holding in *Mille* by going beyond its conclusion that "[w]hat constitutes a reasonable length of time will vary with the context." (*Mille*, *supra*, 182 Cal.App.4th at p. 649.) *Mille*, however, was addressing the question of reasonableness with respect to a single IST defendant. Here, the trial court was faced with a more complex factual situation, in which it had to determine what constituted a reasonable length of time in the context of all IST defendants committed to DSH-Napa from Contra Costa County, while also balancing the interests of those defendants with the interests of both IST defendants in other counties and DSH-Napa. (See *Brewer*, *supra*, 235 Cal.App.4th at pp. 139-140.)

21

pursuant to Penal Code section 1370."[17]  First, DSH has not shown that the 60-day limit contained in the standing order will negatively affect IST defendants outside of Contra Costa County.  The trial court based its time limit on a careful balancing and analysis of the evidence, and a determination that DSH should reasonably be able to admit an IST defendant to a state hospital within 60 days of commitment.  Second, as the trial court stated when it rejected petitioners' equal protection claim:  "[I]t is not DSH-Napa that is singling out certain individuals for preferential treatment[;] rather it is the court's orders mandating the hospital's compliance with the deadline set in that order that creates the lack of uniformity in the treatment of such patients."  Third, we are not willing to defer resolution of this matter on the ground that the standing order in question could theoretically have a negative impact on other IST defendants.  While it would be preferable for this issue to be resolved on a statewide basis—which could be most expeditiously accomplished by the other two branches of government—we cannot ignore the due process rights of Contra Costa County IST defendants at issue in this case, while simply hoping that DSH will admit them, and all IST defendants, in a more timely manner.

## V. *Alleged Circumvention of Established Habeas Procedures*

DSH contends the trial court exceed the scope of its authority under these consolidated habeas petitions by making its order applicable to all future IST defendants committed to DSH in Contra Costa County.

This same contention was rejected in *Brewer*, *supra*, 235 Cal.App.4th at page 138, in which the court observed:  " 'Irrespective of mootness, a habeas corpus petition is "an acceptable vehicle for a general declaration of the procedural rights of individuals detained" involving an issue of general public concern, particularly if it pertains to the

---

[17] DSH has requested that we take judicial notice of a lawsuit filed in Alameda County against, inter alia, DSH, by family members of IST defendants who allege that DSH's delayed admission practices violate IST defendants' federal and state constitutional right to due process and their state constitutional right to a speedy trial.  We now deny the request for judicial notice as unnecessary to our resolution of the issues raised in this appeal.

administration of justice.  [Citation.]'  [Citation.]  '[A] trial court may grant habeas corpus petitioners "prospective or class relief" to redress recurring deprivations of rights at correctional facilities.  [Citation.]  The writ is thus an effective and versatile means by which to remedy persistent violations of prisoners' rights, and has been so used.  [Citation.]'  [Citations.]"  We likewise reject DSH's claim that the standing order improperly obviates established habeas procedures.

## VI.  *Effect of the Amendments to Section 1370*

As previously noted, Assembly Bill No. 1468, made changes affecting the commitment of IST defendants to a state hospital.  (See part I., *ante*.)  The trial court now is required to commit IST defendants to DSH, rather than to a particular hospital, and DSH is required to evaluate each patient to determine placement in the appropriate state hospital, utilizing the 1370 packet, which now must be sent to DSH prior to admission.  (§ 1370, subds. (a)(3) & (a)(5); Welf. & Inst. Code, § 7228.)  After the amendments, the 1370 packet also must include medical records.  (§ 1370, subd. (a)(3)(I).)

In the present case, the parties disagree about the effect of the 2014 amendments to section 1370, which became effective after the trial court issued its order.  On the one hand, DSH argues that these changes, which require "additional individualized assessment[s]" (*Brewer*, *supra*, 235 Cal.App.4th at p. 142), lend further support to its position that there should not be a single transfer deadline for all IST defendants.  Petitioners, on the other hand, argue that the amendments do not "materially affect the order, and require[] remand for only a minor modification," to reflect that DSH now selects the placement location.

We agree with petitioners' assessment.  First, the standing order already conditions the 60-day deadline on the hospital's receipt of the defendant's complete 1370 packet within five court days of the commitment order, and also permits DSH to deny admission if it does not receive the defendant's health information, as specified by the

23

hospital.[18]  Furthermore, DSH-Napa's practice was to pre-screen IST defendants before commitment for escape risk and to then make a placement recommendation to CONREP. CONREP would then submit DSH-Napa's recommendation to the trial court, and the trial court would commit the patient to the hospital recommended by DSH-Napa.  These already existing practices closely resemble the new requirements set forth in amended section 1370.  Thus, in this case, unlike in *Brewer*, in which the trial court imposed a very short (14-day) deadline, the statutory amendments have not materially changed the process of placing IST defendants in Contra Costa County, and reversal of the order is unnecessary.  (Compare *Brewer*, *supra*, 235 Cal.App.4th at p. 142.)

It is, however, necessary to remand the case to the trial court for modification of the standing order to conform to the new language in the relevant provisions of amended section 1370, particularly subdivision (a)(5), which now requires the trial court to commit IST defendants to DSH, which then selects the hospital for placement.

## VI.  *Petitioners' Request for a 30-Day Admission Deadline*

Finally, we reject petitioners' argument, made in its cross-appeal, that due process requires that the time limit in the standing order be shortened to 30 days.  The court in this case considered all of the evidence presented, along with the need to balance the interests of both IST defendants and DSH, before issuing a thoughtful, comprehensive statement of decision and accompanying order that set a time limit of 60 days.  As previously discussed, the evidence supports the court's finding that a 60-day deadline satisfies IST defendants' due process rights, provides sufficient time for DSH to place each defendant, and allows for timely preparation of the 90-day status report pursuant to section 1370, subdivision (b)(1).  Although transferring IST defendants in less than 60 days after commitment should of course remain the goal, the trial court's order

---

[18] At oral argument, petitioners' counsel pointed out that, at the time the trial court issued its standing order, it took only two days from commitment for DSH-Napa to receive the 1370 packet.  Counsel for DSH did not dispute petitioners' counsel's description of these pre-amendment practices or argue that the statutory amendments will significantly alter them, at least in Contra Costa County.

24

realistically places an outside limit on what is statutorily and constitutionally permissible.[19]

## DISPOSITION

The judgment is affirmed, and the matter is remanded to the trial court for modification of the standing order to reflect the relevant changes to section 1370, as discussed in this opinion. The stay previously issued by this court is dissolved upon finality of this decision.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.

---

[19] We also observe that any solution to the problem of the timeliness of placement of IST defendants at the county level cannot begin to resolve the issue statewide. With a handful of distinct orders across the state, priority in admission is given to defendants from counties with standing orders with the shortest admission deadlines, to the possible detriment of defendants both in counties that have standing orders with longer deadlines and, especially, in counties without standing orders. As noted, we believe the 60-day standing order in this case reasonably balances the various interests involved. Nonetheless, the necessarily piecemeal nature of countywide standing orders in general strongly suggests the ultimate need for a more uniform, statewide solution.

Trial Court:                          Contra Costa County Superior Court

Trial Judge:                          Hon. Clare Maier

Attorneys for Appellant:              Kamala D. Harris
                                      Attorney General of California

                                      Julie Weng-Gutierrez
                                      Senior Assistant Attorney General

                                      Cherly L. Feiner
                                      Supervising Deputy Attorney General

                                      Jennifer C. Addams
                                      Deputy Attorney General

Attorneys for Appellants:             Robin Lipetzky
                                      Contra Costa County Public Defender

                                      Stephanie Regular
                                      Deputy Public Defender

                                      Garrick Byers
                                      Deputy Public Defender