Filed 3/4/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff,<br><br>v.<br><br>KAREEM A. et al.,<br><br>Defendants and Respondents;<br><br>STATE DEPARTMENT OF STATE HOSPITALS,<br><br>Objector and Appellant. | B287126<br><br>(Los Angeles County Super. Ct. No. ZM031353 et al.) |
| THE PEOPLE,<br><br>Plaintiff,<br><br>v.<br><br>GILBERT Y.,<br><br>Defendant and Respondent;<br><br>STATE DEPARTMENT OF STATE HOSPITALS,<br><br>Objector and Appellant. | B292685<br><br>(Los Angeles County Super. Ct. No. ZM034519 et al.) |

| | |
|---|---|
| THE PEOPLE, | B292686 |
| Plaintiff, | (Los Angeles County Super. Ct. No. ZM040369 et al.) |
| v. | |
| DANIELA A. et al., | |
| Defendants and Respondents; | |
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Objector and Appellant. | |
| THE PEOPLE, | B293476 |
| Plaintiff, | (Los Angeles County Super. Ct. No. ZM033102 et al.) |
| v. | |
| LATASHA A. et al., | |
| Defendants and Respondents; | |
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Objector and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, James Bianco, Judge. Affirmed.

2

Xavier Becerra, Attorney General, Julie Weng-Gutierrez and Cheryl L. Feiner, Assistant Attorneys General, Susan M. Carson, Gregory M. Cribbs, Gregory D. Brown and Cristine M. Matsushima, Deputy Attorneys General, for Objector and Appellant.

Ricardo D. Garcia, Los Angeles County Public Defender, Albert J. Menaster, Head Deputy Public Defender, and Mark Harvis, Deputy Public Defender, for Defendants and Respondents.

Law Offices of John J. Uribe and John J. Uribe for Defendant and Respondent Richard C.

_____

## INTRODUCTION

When criminal defendants are deemed mentally incompetent to stand trial (IST), they may not be tried until they regain competency.  (Pen. Code, § 1367, subd. (a).)[1]  Instead, the court must halt the proceedings, and order that IST "defendant[s] be delivered by the sheriff to a State Department of State Hospitals [(DSH)] facility" for treatment.  (§ 1370, subd. (a)(1)(B)(i).)  DSH must treat the IST defendants until the person regains competency and can be tried.[2]  (§ 1370, subd. (a)(1)(C); § 1372, subds. (a)(1)-(2), (f).)  DSH is also required within 90 days from the commitment order to "make a written report to the court

_____

[1] All unspecified statutory references are to the Penal Code.

[2] Defendants can only be held at a DSH facility for treatment to regain competency for three years.  (§ 1370, subd. (c)(1).)  After three years, they must be returned to the court for further proceedings.  (*Ibid.*)

3

. . . concerning the defendant's progress toward recovery of mental competence." (§ 1370, subd. (b)(1).)

Under both the federal and California state constitutions, "a person charged . . . with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (*Jackson v. Indiana* (1972) 406 U.S. 715, 738 [92 S.Ct. 1845, 32 L.Ed.2d 435], fn. omitted; see also *In re Davis* (1973) 8 Cal.3d 798, 801.)

Over a decade ago, the number of IST defendants in California outgrew the number of beds DSH had available to treat them. IST defendants began waiting an increasing amount of time in county jails before being transferred to a state hospital. Given these snowballing wait times, courts began adding admission deadlines to their commitment orders to protect IST defendants' constitutional and statutory rights as set forth in *Jackson v. Indiana*, *In re Davis*, and section 1367 et seq. (See, e.g., *People v. Brewer* (2015) 235 Cal.App.4th 122 (*Brewer*).) Those admission deadlines ranged from as short as 14 days to as long as 60 days from the issuance of the commitment order. (Compare *id*. at p. 134 to *In re Loveton* (2016) 244 Cal.App.4th 1025, 1044 (*Loveton*).) DSH nevertheless continued not to admit IST defendants in a timely manner, leaving them to languish in county jail.

In 2016, most Los Angeles County superior court commitment orders provided that IST defendants were to be admitted to a DSH facility within 30 days of the commitment order. DSH did not contest the imposition of that timeframe, but at the same time DSH generally did not abide by it. The approximate average wait time for an IST defendant to gain admission into a DSH facility in 2016 was between 70 and 90 days—leaving insufficient time to treat IST defendants and make the required written report concerning the defendants' progress toward recovery of mental competence within the statutory 90-day deadline of section 1370, subdivision (b)(1).

The trial court here eventually issued orders to show cause (OSCs) why sanctions should not be imposed given DSH's failure to admit IST defendants in a timely manner. It issued the OSCs regarding monetary sanctions only after three years of prior OSCs ordering DSH to explain the delays and working collaboratively with DSH and other stakeholders to try to improve matters, during which time the waitlist expanded rather than contracted. Following extensive briefing, and two evidentiary hearings, the trial court imposed sanctions pursuant to Code of Civil Procedure section 177.5 (section 177.5), in the amount of $1,500 per IST defendant that DSH failed to admit within 60 days of the commitment order.

DSH now appeals from the orders imposing sanctions. DSH argues that section 177.5 does not allow the court to impose sanctions on DSH because DSH is not considered a "person" within the meaning of the statute, that the underlying commitment orders were improper, and that if the orders were proper DSH had good cause or substantial justification for violating them. We conclude the court was permitted to sanction

5

DSH pursuant to section 177.5, and did not abuse its discretion in issuing the underlying commitment orders or in finding DSH did not have good cause or substantial justification for its violations of those orders. Accordingly, we affirm.

## BACKGROUND

### A.    Statutory Framework

"A defendant is deemed mentally incompetent 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*Loveton*, *supra*, 244 Cal.App.4th at p. 1029.) A defendant who is found mentally incompetent to stand trial may not be tried. (§ 1367, subd. (a).) Instead, the court must suspend the proceedings until the defendant becomes mentally competent. (§ 1370, subd. (a)(1)(B).) "The court shall order that the mentally incompetent defendant be delivered by the sheriff to a [DSH] facility" for treatment. (§ 1370, subd. (a)(1)(B)(i).)

Before the defendant can be transferred to a DSH facility, the court must provide DSH with a packet of documents, referred to as a "1370 packet" after the relevant Penal Code section, which includes the defendant's commitment order, a summary of the defendant's criminal history, court-ordered psychiatric examination or evaluation reports, and medical records. (§ 1370, subds. (a)(3)(A)-(I).) DSH then selects which facility the defendant should be sent to for treatment. (§ 1370, subd. (a)(1)(B)(i).)[3] Section 4700 et. seq. of title 9 of the California Code

_____

[3] Prior to 2014, the court selected the DSH hospital in its commitment order. In 2014, with the enactment of Assembly Bill No. 1468 (2013-2014 Reg. Sess.), the Legislature mandated the practice of transmitting section 1370 packets to DSH, and DSH

6

of Regulations, implemented in September 2016, further regulates the DSH patient admission process.

Section 1370 does not provide an explicit time frame for how quickly a defendant found incompetent to stand trial must be delivered to a DSH facility after the court has issued a commitment order. It does, however, provide that "[w]ithin 90-days of . . . commitment . . . , the medical director of the [DSH] facility . . . shall make a written report to the court . . . concerning the defendant's progress toward recovery of mental competence . . . ." (§ 1370, subd. (b)(1).) Given this 90-day reporting requirement, and the antecedent requirements that "the defendant must be delivered to the hospital, the hospital must examine the defendant and provide the defendant with treatment that will promote speedy restoration to competence, and the hospital's medical director must document the defendant's progress in a report to the court" (*In re Mille* (2010) 182 Cal.App.4th 635, 650 (*Mille*)), section 1370 requires that "a defendant needs sufficient time at the state mental hospital to be duly evaluated, potentially to derive some benefit from the prescribed treatment, and for such progress to be reported to the court" before the 90-day reporting requirement accrues. (*Mille*, *supra*, at p. 650.)

While what constitutes a reasonable length of time will vary based on the particulars of each case, no court has held a period of less than 30 days of DSH treatment prior to the 90-day

---

selecting the appropriate placement for the IST defendant. (Stats. 2014, ch. 26, § 25, eff. June 20, 2014.) In 2017, DSH's discretion was further broadened when it was permitted to select the specific facility and program within that facility to which the defendant would be committed. (Stats. 2017, ch. 17, § 30.)

report—in other words, a transfer to DSH more than 60 days from the commitment order—is reasonable. (See *People v. Hooper* (2019) 40 Cal.App.5th 685 (*Hooper*) [upholding order sanctioning DSH for failing to admit defendants within 60 days of commitment order]; *Loveton*, *supra*, 244 Cal.App.4th 1025 [upholding order requiring DSH to admit defendants within 60 days of commitment order]; *Mille*, *supra*, 182 Cal.App.4th at p. 650 [trial court should have granted habeas petition of jailed defendant filed 30 days after commitment order and ordered defendant delivered to DSH "forthwith"].)

Once the state hospital's medical director deems the defendant's competency restored, DSH must file a certificate of restoration to competence with the court and the court must order the defendant returned to court. (§ 1370, subd. (a)(1)(C); § 1372, subd. (a)(1)-(2).) The court then holds a hearing to determine whether it approves the certificate of restoration, or whether it finds the defendant requires further treatment and should be sent back to the DSH facility. (§ 1372, subd. (f).)

## B. Historical Background

### 1. *The Increase in IST Defendants and Resulting Waitlist for Treatment at DSH Facilities*

The number of defendants found incompetent to stand trial has increased significantly in California, as well as throughout the country, over the past decade. This led to the IST population outgrowing the number of beds DSH has available to treat IST defendants. As a result, DSH created a waitlist for IST defendants committed to state hospitals.

Since its creation, the waitlist has grown continuously. According to DSH, there were about 600 IST defendants on the waitlist in December 2016, 854 IST defendants on the waitlist in

8

December 2017, and 1,116 IST defendants on the waitlist in May 2018.  To put that number in perspective, DSH has about 1,500 beds statewide dedicated to treating IST defendants.  Defendants committed in 2016 were waiting an average of somewhere between 70 and 90 days in jail before being transported to a DSH facility.

**2.**      ***Prior Legal Challenges to Delays in Admission***

As the delay between the date of their commitment order and admission into a state hospital grew, IST defendants statewide began filing legal challenges against DSH, arguing their extended wait time was both statutorily and constitutionally impermissible.  In 2010, in *Mille*, the defendant filed a habeas petition 30 days after his commitment order, when he still had not been transferred to a DSH facility.  (*Mille*, *supra*, 182 Cal.App.4th at p. 640.)  The trial court denied the petition, and the defendant was not delivered to a DSH facility until 84 days after the court had issued its commitment order and six days before the hospital's medical director had to submit a report to the court.  (*Ibid*.)  Division Three of this appellate district held that was not an acceptable delay, and that the defendant's habeas petition 30 days after his commitment order should have been granted and the defendant transferred to DSH forthwith.  (*Id*. at p. 650.)

In 2013, Los Angeles courts began issuing OSCs after DSH violated admission deadlines in commitment orders.  The initial OSCs threatened neither sanctions nor contempt.  The orders instead required DSH to explain the delay to the court.  Throughout 2014 and 2015, Los Angeles County superior court representatives convened a series of meetings with DSH, the Los Angeles Sheriff's Department, the California Department of

9

Health and Human Services, the California Department of Developmental Services, and other judges and attorneys to try to help DSH reduce wait times. As part of these efforts, the trial court took numerous trips with DSH to visit DSH facilities and a jail-based competency treatment (JBCT) program that DSH was developing. The trial court also participated in dozens of meetings and worked with DSH to begin committing Los Angeles IST defendants to the JBCT program. Despite these efforts, the IST waitlist continued to grow.

Meanwhile, in Sacramento County, DSH challenged the ability of trial courts to include admit-by dates in commitment orders for IST defendants. In 2015, the Third District Court of Appeal held in *Brewer* that courts are permitted by statute to set deadlines in their commitment orders establishing the outer limit of a reasonable time in which IST defendants should be admitted to a DSH facility. (*Brewer*, *supra*, 235 Cal.App.4th at p. 137.) In setting a deadline, the court held, the judicial branch is not violating the separation of powers, but rather, "the court is enforcing the statutory imperative for a meaningful progress report within 90 days of the commitment order." (*Ibid.*)

In 2016, in *Loveton*, DSH challenged an order imposing 60-day admission deadlines for all IST defendants in Contra Costa County. (*Loveton*, *supra*, 244 Cal.App.4th at p. 1028.) The First District held that the 60-day admission deadline, imposed after balancing the interests of IST defendants and DSH-Napa (the DSH facility at issue), was appropriate and "established an 'outer limit' of what constitutes a reasonable time for transfer of Contra Costa County IST defendants to DSH-Napa, in order to meet the statutory 90-day reporting deadline." (*Id.* at pp. 1043-1044.)

In 2019, in *Hooper*, a group of Contra Costa County IST defendants requested monetary sanctions against DSH pursuant to section 177.5 for failing to abide by the 60-day admission deadline affirmed in *Loveton*. (*Hooper*, *supra*, 40 Cal.App.5th at p. 689.) The trial court found DSH violated the *Loveton* order without good cause or substantial justification in numerous cases, and sanctioned DSH. (*Hooper*, *supra*, at pp. 690-691.) The First District found the trial court had authority to sanction DSH, had applied section 177.5 correctly, and affirmed the sanctions award as to all defendants except one. (*Hooper*, *supra*, at pp. 701-702.)[4]

## C.     Procedural Background

These consolidated appeals involve 247 IST defendants, most of whom were committed to DSH between May and December of 2016. In all 247 cases, the trial court ordered DSH to admit the defendant to a state hospital within roughly 30 days.[5] In all 247 cases, DSH failed to admit the IST defendant until 60 days or more after the commitment order.

The trial court initially issued OSCs as to why sanctions should not be ordered pursuant to section 177.5. Section 177.5 provides that "[a] judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars

_____

[4] As to that one defendant, the *Hooper* court found no substantial evidence that DSH violated the *Loveton* order given the timing of that defendant's 1370 packet. (*Hooper*, *supra*, at p. 701.)

[5] We use the term "roughly" to avoid unnecessary detail about each commitment order, which set forth a specific, individualized admit-by date. Overall, most of the admit-by dates clustered around 30 days after the commitment order.

11

($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification." Section 177.5 applies to both criminal and civil matters. (*People v. Tabb* (1991) 228 Cal.App.3d 1300, 1310 (*Tabb*).)

The court accepted briefing and evidence from DSH in response to the OSCs. It also conducted two evidentiary hearings where it heard testimony from five DSH employees, including the Forensic Services Manager at DSH-Patton State Hospital (DSH-Patton); a Program Assistant at DSH-Patton; the Chief Psychologist with DSH's Forensic Services Division; the Admissions Coordinator at DSH-Metropolitan State Hospital (DSH-Metropolitan); and the Deputy Director of Hospital Strategic Planning and Implementation. Those witnesses testified as to the current state of affairs at DSH, including details about how the waitlist worked and changes DSH had implemented and was continuing to implement to shorten wait times. The court questioned each witness at length regarding DSH's recent efforts and the agency's limitations.

Finding no good cause or substantial justification for DSH's repeated violations, the court issued four separate orders imposing $1,500 in sanctions on DSH per each IST defendant that DSH failed to admit for treatment within 60 days of the commitment order. The first order was issued on November 9, 2017; it concerned 140 IST defendants who had been committed to a DSH facility between May and August of 2016, and who had not been admitted within 60 days of their respective commitment orders. Each of these defendants waited from 61 to 140 days in jail following the commitment order before being admitted to treatment, with an average wait time of approximately 92 days.

Based on DSH's failure to comply with the commitment order within 60 days as to these 140 defendants, the trial court sanctioned DSH $1,500 for each of the 140 defendants ($210,000 in total).

The next two orders were issued on August 2, 2018. One imposed sanctions of $1,500 for failing to admit one IST defendant into treatment until 103 days after the commitment order. The second order issued that date imposed $13,500 in sanctions for failing to admit nine DSH defendants within 60 days of the commitment order. These nine defendants waited from 99 to 114 days in jail following the commitment order before being admitted for treatment.

The fourth order was issued on October 4, 2018, and concerned 186 IST defendants ordered to a DSH facility between September and December 2016. Of these 186 defendants, 89 were admitted to treatment after the 30-day admission deadline but within 60 days of the commitment order. The trial court found good cause and substantial justification for those lesser delays, and declined to impose sanctions with regard to any of those defendants. The remaining 97 defendants waited from 61 to 139 days in jail before being admitted to treatment, with an average wait of approximately 86 days. The court imposed sanctions of $1,500 for each of these 97 defendants, for a total monetary sanction of $145,500.

## DISCUSSION

### A.     Standard of Review

Although DSH did not challenge the underlying commitment orders at the time they were made, " '[d]ue process, as well as the statute itself, requires that a person against whom Code of Civil Procedure section 177.5 sanctions may be imposed

13

be given adequate notice that such sanctions are being considered, . . . and an objective hearing at which the person is permitted to address the lawfulness of the order, the existence of the violation, and the absence of good cause or substantial justification for the violation.' [Citation.]" (*People v. Hundal* (2008) 168 Cal.App.4th 965, 970.) DSH challenged the commitment orders in connection with the OSCs, and accordingly has not waived its arguments regarding the lawfulness of those underlying commitment orders.

The trial court's orders directing DSH to admit IST defendants within a certain period of time granted injunctive relief. (*Brewer*, *supra*, 235 Cal.App.4th at p. 135.) Accordingly, the court's refusal to dissolve or modify those orders equates to a court refusal to dissolve an injunction. (*Ibid.*) "An order ' " 'refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case' " and "will not be modified or dissolved on appeal except for an abuse of discretion." ' [Citation.]" (*Id.* at p. 136.)

Likewise, we review the orders imposing sanctions for abuse of discretion. (See *Hooper*, *supra*, 40 Cal.App.5th at p. 691.) We look to see whether the trial court has "exercise[d] its discretion in a 'reasonable manner with one of the statutorily authorized purposes in mind' " and whether it was " 'guided by existing legal standards.' [Citation.] A mere difference of opinion between the appellate and trial courts is insufficient to warrant reversal. [Citation.] Questions of law, on the other hand, are subject to de novo review. [Citation.] When a trial court relies on a statute as authority to award sanctions, we review the

14

interpretation of the statute de novo.  [Citation.]"  (*Id*. at pp. 691-692.)

**B.      Section 177.5 Permitted The Sanctions At Issue**

DSH does not dispute that it repeatedly violated the trial court's orders.  Instead, DSH begins by challenging the trial court's authority under section 177.5 to impose sanctions on DSH for those violations.  Section 177.5 permits the imposition of monetary sanctions "for any violation of a lawful court order by a person," and further provides that "[f]or the purposes of this section, the term 'person' includes a witness, a party, a party's attorney, or both."  (*Ibid*.)  DSH, as it did in *Hooper*, asserts it was not a witness, party, or attorney in the criminal case or the competency proceedings, and thus not a "person" subject to sanction under section 177.5.  Like the *Hooper* court, we reject this argument.

**1.      *Principles of Statutory Construction***

In analyzing the scope of section 177.5, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.)  " 'In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided.  The words of the statute must be construed in context, keeping in mind the statutory purpose . . . .' " (*Tabb*, *supra*, 228 Cal.App.3d at p. 1307.)  Our goal is to " ' "select the construction that comports most closely with the apparent intent of the

15

Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.)

### 2. *Statutory Analysis*

As it did in *Hooper*, DSH relies on *Vidrio v. Hernandez* (2009) 172 Cal.App.4th 1443 (*Vidrio*) to support its reading of section 177.5. In *Vidrio*, the trial court imposed sanctions pursuant to section 177.5 on an insurance company for failing to participate in good faith in a mandatory settlement conference. (*Vidrio*, *supra*, at pp. 1451-1452.) The Court of Appeal reversed, holding that section 177.5 was inapplicable on several alternate grounds. *Vidrio* found section 177.5 inapposite because as an initial matter, section 177.5 requires a lawful court order. (*Vidrio*, *supra*, at p. 1455.) Though a local rule required the insurance company to participate in the settlement conference, the court had never issued an order directing the insurance company to do anything. (*Ibid.*) The *Vidrio* court additionally found section 177.5 inapplicable because "section 177.5 provides sanctions may be awarded against a 'person,' defined to include 'a witness, a party, a party's attorney, or both,' " and the insurance company did not fall within any of those categories. (*Vidrio*, *supra*, at p. 1455.)[6]

---

[6] The *Vidrio* court further reversed because the insurance company was sanctioned more than the $1,500 limit set forth in the statute, and part of the sanctions were awarded to the plaintiff's attorney instead of the court. (*Vidrio*, *supra*, 172 Cal.App.4th at p. 1455.) These two additional alternative grounds are not at issue in this appeal.

DSH ignores that the insurer in *Vidrio* did not violate any court order, whereas DSH was sanctioned for violating a court order. DSH instead seizes upon the alternative holding in *Vidrio* as interpreting section 177.5 to apply solely to witnesses, parties, and their counsel. *Vidrio*, however, did not analyze the statute's use of the word "includes" or its legislative history and purpose. "*Vidrio* thus does not convince us the trial court erred." (*Hooper*, *supra*, 40 Cal.App.5th at p. 693.)

Like *Hooper*, we start by noting that our Supreme Court has held that "the word 'including' in a statute is 'ordinarily a term of enlargement rather than limitation.' [Citations.]" (*Hassan v. Mercy American River Hospital*, *supra*, 31 Cal.4th at p. 717 [the word "includes" in Code Civ. Proc., § 14's definition of "person" does not limit it to meaning only the listed entities].) This alone suggests section 177.5 is not limited solely to witnesses, parties, or counsel for parties.

To determine how broadly "person" may be construed, we turn next to legislative purpose. At DSH's request, we have taken judicial notice of numerous documents of section 177.5's legislative history. The original draft of the bill read: "Person includes, *but is not limited to*, a party, a party's attorney, or both." (Assem. Bill No. 3573 (1981-1982 Reg. Sess.), italics added.) The bill's language was then amended to remove the phrase "but is not limited to" and add the words "a witness." (Code Civ. Proc., § 177.5.) These changes were made after the Legislature expressed concern that the bill would authorize trial courts to impose money sanctions against "people not directly involved in a specific action" such as "reporters, demonstrators or courtroom observers[,]" rather than only against "people directly involved in a proceeding before the court" such as "parties,

17

attorney's [*sic*], witnesses, jurors[.]" (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as amended Apr. 29, 1982.)

Several summaries of the bill, including those written by both the Assembly and Senate Committees on Judiciary, and the summary that appeared in the Enrolled Bill Report to the Governor, describe the bill as allowing trial courts to impose sanctions of up to $1,500 for any violation of a lawful court order by "a witness, party or party's attorney." (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as amended Apr. 29, 1982; Sen. Com. on Judiciary, Rep. on Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as amended May 3, 1982; Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 3573 (1981-1982 Reg. Sess.) Aug. 11, 1982.)

DSH argues that the drafters' concerns, along with their deletion of the words "but not limited to," means the Legislature unmistakably intended to limit sanctions under section 177.5 exclusively to witnesses, parties, and parties' attorneys. We are not convinced. In describing its concerns, the Legislature gave examples of courtroom attendees such as reporters, demonstrators, or courtroom observers who could potentially interfere in some way with court proceedings and be sanctioned as a result. (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as introduced Mar. 15, 1982.) The Legislature contrasted those types of courtroom participants to "people directly involved in a proceeding before the court," such as "parties, attorney's [*sic*], witnesses, jurors." (See *ibid.*)

The Legislature's intent was accordingly to allow judicial officers the ability to sanction "people directly involved in a proceeding before the court." (Assem. Com. on Judiciary, Rep. on

18

Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as introduced Mar. 15, 1982.)  The fact that a person before the court does not fit squarely into the definition of a party, a party's attorney, or a witness does not exclude them from being a person directly involved in a proceeding.  Had the Legislature wanted to limit "person" to only those three categories, it would have omitted the word "includes" altogether.

Comparing section 177.5 to Code of Civil Procedure section 128.5 (section 128.5) confirms this.  Section 177.5 was enacted to supplement section 128.5.[7]  Section 128.5 authorizes a trial court to impose certain sanctions in civil cases but explicitly limits those who the trial court can sanction to parties and attorneys: "A trial court may order a party, the party's attorney, or both, to pay the reasonable expenses, including attorney's fees, incurred by another party as a result of actions or tactics, made in bad faith, that are frivolous or solely intended to cause unnecessary delay."  (Code Civ. Proc., § 128.5, subd. (a).)  Because the Legislature enacted section 177.5 intending to supplement section 128.5, if the Legislature had wanted to limit section 177.5's applicability to only a witness, a party, or a party's

---

[7] The Legislative Counsel's Digest on section 177.5 explained that section 128.5 "authorizes trial courts to order a party or the party's attorney to pay any reasonable expenses incurred by another party as a result of tactics or actions not based on good faith which are frivolous or which cause unnecessary delay," and that section 177.5, "in addition, would authorize a judicial officer to impose money sanctions . . . for any violation of a lawful court order by a witness, a party, or a party's attorney."  (Legis. Counsel's Dig., Assem. Bill No. 3573 (1981-1982 Reg. Sess.).)

attorney, it would have drafted it in the same way it drafted section 128.5. (See *People v. Drake* (1977) 19 Cal.3d 749, 755 [" ' "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" ' "].) The word "includes" cannot be treated as mere surplusage. (See *Hassan v. Mercy American River Hospital, supra*, 31 Cal.4th at pp. 717-718; see also *Tabb, supra*, 228 Cal.App.3d at p. 1307.)

Because we cannot ignore the word "includes," and because the Legislature expressed its intent that section 177.5 apply to persons other than witnesses, parties, and parties' counsel so long as those other persons are directly involved in proceedings, we decline to read section 177.5 as DSH suggests. We need not define how broadly section 177.5 sweeps beyond witnesses, parties, and parties' counsel in other factual contexts or statutory regimes not before us, and decline to do so. Here, given the particular circumstances involving "DSH's statutory obligation in the criminal justice process relating to IST defendants, DSH resembles a party far more than it resembles one 'not directly involved' in an action, such as a reporter, demonstrator, or courtroom observer." (*Hooper, supra*, 40 Cal.App.5th at p. 693.) The trial court had a statutory duty to order DSH to admit IST patients for those defendants' criminal cases to proceed. (§ 1370, subd. (a)(B)(i).) DSH, for its part, had the ability to participate in proceedings around those orders and did so, including at the time these specific orders were made recommending the placement to be included in the commitment order. It also had the contemporaneous opportunity, if it chose, to challenge the admit-

20

by date set forth in the commitment order. (See *Brewster*, *supra*, 235 Cal.App.4th at p. 128.)

Because IST defendants' criminal trials cannot, as a matter of law, proceed without DSH admitting patients, administering treatment, and reporting to the trial court on the results of that treatment, to rule section 177.5 does not apply to lawful orders to DSH would defeat the purpose of the statute. Certainly by the time the court issues such an order, DSH becomes a person "directly involved in" each of the "specific actions" at hand. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as amended Apr. 29, 1982.; see also *Tabb*, *supra*, 228 Cal.App.3d at pp. 1308-1309 [§ 177.5 seeks to prevent inconvenience by failure of people to follow court's orders, regardless of whether the person is in a civil or criminal case].) Given the specific facts applicable here, we conclude DSH was a "person" subject to section 177.5.

### 3. *The Ability to Sanction DSH Here Is Consistent With Section 177.5's Purpose*

In reviewing a sanctions order, we look to see whether the court has "exercise[d] its discretion in a 'reasonable manner with one of the statutorily authorized purposes in mind.' " (*Hooper*, *supra*, 40 Cal.App.5th at p. 691.) " 'The apparent purpose of [section 177.5] is to compensate public agencies for the cost of unnecessary hearings.' " (*In re Woodham* (2001) 95 Cal.App.4th 438, 443, quoting *Moyal v. Lanphear* (1989) 208 Cal.App.3d 491, 499; see also *Seykora v. Superior Court* (1991) 232 Cal.App.3d 1075, 1080.) "However, the statute's scope was not intended to be limited to compensatory sanctions but instead was contemplated to authorize punitive sanctions as well." (*Woodham*, *supra*, at p. 444; see also *Hooper*, *supra*, 40 Cal.App.5th at pp. 694-695;

21

*People v. Landers* (2019) 31 Cal.App.5th 288, 303, 307; *Tabb*, *supra*, 228 Cal.App.3d at pp. 1306, 1309-1310; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as amended May 3, 1982, p. 2 ["purpose of the bill is to broaden the types of misbehavior that a court may punish"]; Enrolled Bill Rep., Assem. Bill No. 3573 (1982-1983 Reg. Sess.) Sept. 29, 1982 ["it is not unreasonable to give the courts additional discretionary authority to deter misconduct"].)

Here, the court was entitled to punish the repeated violation of orders designed to ensure compliance with IST defendants' constitutional and statutory rights. The sanctions further had a compensatory purpose. By continually violating the court's orders, DSH created the need for significant court efforts to encourage compliance with the 90-day reporting requirement, as well as the court's attention to the ensuing briefing, evidence production, and hearings when tardy admission dates continued to result in non-compliance with the 90-day reporting requirement.

Furthermore, in sanctioning DSH, the court was compensating the judicial system for DSH causing unnecessary delay of hundreds of criminal cases. "[B]ecause Penal Code section 1367 bars courts from trying and sentencing IST defendants," any criminal case involving an IST defendant cannot move forward until DSH treats those defendants. (*Hooper*, *supra*, 40 Cal.App.5th at p. 693.) When DSH stalls the treatment process, the entire criminal case (here, all 247 criminal cases) gets stalled too, implicating not only the defendants' rights, but the People's right for the criminal case not to be unnecessarily delayed (with attendant witness and other evidentiary difficulties) and the right of the alleged victims to a

22

prompt and final conclusion of the criminal case. (See Cal. Const., art. I, § 28, subd. (b)(9).) "DSH's provision of timely treatment plays an essential auxiliary role in the proper functioning of the criminal justice system," and interpreting section 177.5 as excluding such a critical person in the system would fly in the face of the Legislature's apparent intent. (*Hooper*, *supra*, 40 Cal.App.5th at p. 693.)

## C.     The Court Did Not Abuse its Discretion in Refusing to Modify or Dissolve its Admit-by Orders

DSH next challenges the underlying commitment orders as improper when issued. Under section 177.5, the order violated must be "lawful." According to DSH, *Loveton* established that "the constitutional due process standard for the admission of an IST defendant . . . is 60 days from commitment, assuming timely receipt of the patient's intake package." DSH contends the shorter, 30-day deadlines imposed by the trial court were arbitrary and impermissibly shortened the 60-day time period approved in *Loveton*.

We do not agree that *Loveton* established a rigid 60-day admission deadline statewide. First, prior to the *Loveton* decision, *Mille* held that after ordering an IST defendant to a state mental hospital, "the court must . . . ensure that the defendant is actually transferred to the state hospital within a *reasonable period of time.*" (*Mille*, *supra*, 182 Cal.App.4th at p. 650, italics added.) In *Brewer*, the court reiterated that the trial court must carefully consider what a reasonable deadline is, and impose a court order accordingly. (*Brewer*, *supra*, 235 Cal.App.4th at p. 142.)

*Loveton* was no different. The *Loveton* court emphasized that the trial court must set a reasonable admission deadline by

23

balancing the different interests at stake.  (*Loveton*, *supra*, 244 Cal.App.4th at p. 1044.)  Rather than imposing a 60-day admission deadline statewide, it determined that the trial court, *in that case*, for Contra Costa County's IST population, "found that 60 days 'constitutes a reasonable time to effectuate a transfer from the county jail to a state mental hospital' " and was thus a reasonable "outer limit" for effectuating the defendant's transfer.  (*Id.* at pp. 1043-1044.)  *Loveton* repeatedly cited the trial court's balancing of interests between IST defendants and DSH-Napa, the only state hospital at issue in that case.  (*Id.* at pp. 1035-1036; see also *Hooper*, *supra*, 40 Cal.App.5th at p. 690.)

DSH stresses that the *Loveton* court rejected the IST defendants' counter-argument in that case that the trial court's 60-day deadline should be shortened to 30 days.  (*Loveton*, *supra*, 244 Cal.App.4th at p. 1047.)  However, the *Loveton* court did not conclude that a 30-day admission deadline was, as a matter of law, unreasonable.  (*Ibid.*)  Rather, it affirmed the trial court's order, finding it did not abuse its discretion in setting a 60-day deadline because the order was accompanied with "a thoughtful, comprehensive statement of decision" and supporting evidence. (*Ibid.*)  *Loveton* held the trial court properly balanced the several interests at stake in reaching its 60-day admission deadline, including "IST defendants' due process rights to receive treatment within a reasonable period of time; the statutory requirements of section 1370, subdivision (b)(1); and DSH-Napa's interest in providing uniform treatment to" all IST patients on the waitlist.  (*Id.* at p. 1044.)

Here, nothing in the record suggests that the court did not adequately balance those same factors in deciding that a roughly 30-day admission deadline was reasonable in the particular cases

before it.  "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  DSH did not object to the 30-day admission deadlines when it initially received the commitment orders, and never litigated the admission deadlines at the time they were ordered as it did in *Brewer* and *Loveton.*  Accordingly, there is no record before us suggesting that at the time those orders were entered the deadlines imposed were arbitrary, or failed to balance the IST defendants' due process rights to receive treatment within a reasonable period of time, the statutory requirements of section 1370, and DSH's interests in providing uniform treatment.  We will not presume to the contrary.

At the OSC evidentiary hearings, the record of which is before us, the court asked DSH's witnesses about each step in the admission process, the waitlist, how DSH determined to which hospital an IST defendant would be admitted, and about the sheriff's transportation of IST defendants from Los Angeles County jails to state hospitals, among other things.  The trial court then acknowledged the *Loveton* court believed a 60-day admission deadline was reasonable for Contra Costa County defendants, but explained that after balancing the DSH's efforts and limitations with the conditions in which Los Angeles County IST defendants had to wait for admission into state hospitals, it believed a 30-day admission deadline for these defendants was more appropriate.  The trial court, having worked with DSH on these issues for many years, was intimately familiar with Los Angeles County's IST population, as well as with DSH's limitations and efforts.  We therefore presume, as we must, that the trial court considered all the evidence offered by DSH in

25

reaching its conclusion that 30 days was the most appropriate and reasonable admission deadline.  (See Evid. Code, § 664; *In re Julian R.* (2009) 47 Cal.4th 487, 499.)  DSH points to nothing in the record to suggest the trial court abused its discretion in making that determination as to the IST defendants at issue in this appeal.[8]

We share the *Loveton*'s court belief that it would be preferable for the issue of an admit-by time limit to be resolved on a statewide basis by the other two branches of government. (*Loveton, supra*, 244 Cal.App.4th at p. 1045.)  The *Loveton* decision was issued four years ago.  Given the continuing lack of a statewide resolution, we, like the court in *Loveton*, "cannot ignore the due process rights of [Los Angeles County] IST defendants at issue in this case, while simply hoping that DSH will admit them, and all IST defendants, in a more timely manner."  (*Ibid.*)

## D. The Trial Court Did Not Abuse Its Discretion in Finding DSH Did Not Have Good Cause or Substantial Justification for the Failure to Comply with the Commitment Orders

DSH next argues it had good cause and substantial justification for its failure to comply with the commitment orders. Section 177.5 differs from section 128.5 and from contempt

---

[8] The trial court in *Loveton* entered a standing order for all cases.  (*Loveton, supra*, 244 Cal.App.4th at p. 1028.)  Because the record does not indicate the court here entered a standing order or balanced competing interests more globally, and instead made individual orders with particularized admit-by dates, we neither approve or disapprove of a 30-day admit-by limit in any case beyond those presently before us.

26

proceedings, both of which require the court to make a subjective determination of the party's intentions. (See *Seykora v. Superior Court, supra*, 232 Cal.App.3d at p. 1081; *Tabb, supra*, 228 Cal.App.3d at p. 1311.) Section 177.5 requires only that a court find the person violated the order "without good cause or substantial justification." This does not require "a willful violation, but merely one committed . . . without a valid excuse." (*Seykora, supra*, at p. 1081; *Tabb, supra*, at p. 1311.)

We begin by noting that DSH expressly requests that we find "a 60-day admit-by deadline represents a reasonable outer limit," and that the trial court did not sanction DSH for any violation shorter than the very 60-day limit DSH concedes should be the outer limit on an admit-by date.[9] DSH nevertheless claims there was good cause and substantial justification for exceeding this 60-day time period because the court ignored the reality of the fact that "DSH cannot build new beds overnight."

The trial court never implied it thought DSH should or could build new beds overnight. Nor is there any indication in the record that the court ignored DSH's limitations and the reality of the complex situation at hand. The court instead found that given the many years DSH has had to address excessive wait times, it has not done enough to warrant continuous excusal from abiding by the court's commitment orders, especially given that violation of the court's orders means a violation of IST defendants' constitutional and statutory rights.

---

[9] This request was made in DSH's appellate briefing. DSH sought to backtrack from it at oral argument, suggesting there was no reasonable outer limit on an admit-by date.

27

DSH has had an excessive waitlist for IST defendants since at least 2010, when the admit-by orders were first challenged in *Mille, supra*, 182 Cal.App.4th 635. In the evidence it presented and through the testimony it elicited at the evidentiary hearings, DSH explained the efforts it had taken to increase the bed capacity for IST defendants at state hospitals, including making changes to the waitlist, developing pre-trial diversion programs, adding beds to treat IST defendants, improving efficiency in placement and transport, working with courts and county jails to obtain involuntary medication orders, improving psychological evaluations, or alienist reports, to minimize the number of malingerers incorrectly found IST, and implementing the JBCT program.

After having considered all of this evidence, and after having inquired at length regarding DSH's efforts and improvements, the court concluded DSH did not have a valid excuse for violating the commitment orders. The court's conclusion rested largely on the amount of time DSH has had to address the problems, and its failure to do so. DSH has had over a decade to evolve in order to meet the rising demand of IST beds, and yet the IST waitlist has continued to grow. The Los Angeles Superior Court, and this trial court in particular, has been overseeing DSH's efforts for many years as those efforts impact Los Angeles County IST defendants.

The trial court did not ignore the efforts of DSH. The court explicitly considered those efforts, and credited them for its decision not to sanction DSH for any cases in which DSH admitted IST defendants within 60 days of the commitment order, as well as for cases where extenuating circumstances or a delay in paperwork led to a delay in admission. At the same

28

time, it found those efforts did not constitute a valid excuse for continuing to violate the court's orders beyond (in many cases, well beyond) the 60-day mark that DSH itself advocates as the reasonable outer limit for admission.

We acknowledge DSH's position that paying sanctions deprives it of funds that could otherwise be used to address the waitlist, and other means may have been available to address its long record of failing to comply with the court's orders, section 1370, and IST defendants' rights. But given the longevity of this crisis, the importance of the rights at stake, and the court's long-standing attention to the issue, the court did not " 'exceed the bounds of reason, all of the circumstances being considered,' " in ruling that DSH's efforts did not excuse it from violating the court's orders by not admitting defendants for treatment for more than 60 days after the commitment order. (*Woodham*, *supra*, 95 Cal.App.4th at p. 443.)

## E.   The Court Did Not Abuse Its Discretion in Overruling Certain of DSH's Placement Recommendations

DSH finally argues, with regard to 21 of the IST defendants at issue, that any excessive delay was actually the fault of the trial court for disagreeing with DSH's initial placement recommendation. Specifically, DSH claims that the court sanctioned DSH for the untimely admission of 21 IST defendants for which DSH had recommended JBCT treatment—where there were beds available—and the court overruled DSH's recommendation and ordered state hospital placement.[10] We

_____

[10] At the time of the placements at issue in this appeal, the trial court had authority to decide the placement. As mentioned previously, after a 2017 amendment to Penal Code section 1370,

29

review the court's placement decision for abuse of discretion. (See *People v. Sword* (1994) 29 Cal.App.4th 614, 624-625.)

In its order imposing sanctions, the court explained that there were significant differences between treatment at a state hospital and treatment at a county jail, and that because the DSH evaluators never met with the defendants, the court, after hearing arguments from both defendants' counsel and prosecutors, was in the best position to decide where those defendants should be placed. There are no details regarding the placement hearings in which the court decided against DSH's recommendations. We have before us only the original placement evaluations, and the court's ensuing order. Based on this limited record, we cannot say that the trial court abused the discretion it had at the time when it decided not to follow the recommendation for JBCT and instead committed the defendants to a state hospital.

## DISPOSITION

The sanctions orders are affirmed.

CERTIFIED FOR PUBLICATION

WEINGART, J.*

We concur:

ROTHSCHILD, P. J.          BENDIX, J.

---

DSH now has the discretion, rather than the trial court, to decide into which type of facility an IST defendant should be placed. (Stats. 2017, ch. 17, § 30.)

*\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*