Filed 9/28/23  P. v. D.H. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff,<br><br>v.<br><br>D.H.,<br><br>Defendant and Respondent,<br><br>STATE DEPARTMENT OF STATE HOSPITALS,<br><br>Objector and Appellant. | F083688<br><br>(Super. Ct. Nos. CV64186, CRF62716, CRF65139, CRM61668, CRM61727, CRM61768, CRM61822, CRM61837, CRM61838, CRM61840, CRM61857 & CRM61978)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tuolumne County.  Kevin Seibert, Judge.

Rob Bonta, Attorney General, Cheryl Feiner, Assistant Attorney General, Gregory D. Brown, Lisa A. Tillman and Samona L. Taylor, Deputy Attorneys General, for Objector and Appellant.

No appearance for Plaintiff.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

The State Department of State Hospitals (Department or DSH) oversees state hospitals that provide treatment to individuals facing criminal charges who are incompetent to stand trial (IST).  The trial court found defendant D.H. incompetent to stand trial in 11 criminal cases pending against him and ordered that D.H. be delivered to the Department at a DSH facility for competency training pursuant to Penal Code section 1370, but the Department did not admit D.H. for treatment.  The trial court issued an order for the Department to show cause why sanctions should not be imposed against it for failing to admit D.H. to a state hospital pursuant to Penal Code section 1370.  The trial court found the Department in violation of the commitment order and imposed monetary sanctions under Code of Civil Procedure section 177.5[1] totaling $16,500—$1,500 for each of the 11 cases pending against D.H.

The Department appeals, arguing:  (1) it had good cause or substantial justification for violating the order; (2) the sanctions order did not include reasons for granting sanctions; and (3) the sanctions order erroneously imposed monetary sanctions that exceed the $1,500 limit of section 177.5.[2]  We agree the trial court erred in imposing $1,500 in sanctions for each pending criminal case and the written order imposing sanctions failed to "recite in detail the conduct or circumstances justifying the order." (§ 177.5.)  Since remand is required for the trial court to address these issues, we do not reach the issue of whether the trial court abused its discretion in imposing sanctions.

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

[2]     The Department filed a motion asking us to take judicial notice of certain documents pertaining to the legislative history of section 177.5, the Department's notices of the resumption of admissions at certain facilities, the Department's November 2021 Vaccine Administration Report, and the writ of mandate issued in *Stiavetti v. Clendenin*, Alameda County Superior Court case No. RG15779731.  We grant the motion for judicial notice in its entirety.  (Evid. Code, §§ 452, subds. (c), (d) & (h), 459, subd. (a).)

## BACKGROUND

### A.     IST Statutory Scheme

A defendant may not be tried or sentenced while mentally incompetent.  (Pen. Code, § 1367, subd. (a).)  If there is a doubt as to the defendant's competency to stand trial, criminal proceedings are suspended, and the defendant's mental competence is determined in a hearing.  (*Id.*, § 1368, subds. (a)-(c).)  If the court determines the defendant is not competent to stand trial, the court must make further orders regarding the defendant's placement for receiving competency treatment.  (*Id.*, § 1370, subd. (a)(2)(A)(i).)

The court can order an IST defendant to receive competency treatment at a DSH facility.  (Pen. Code, § 1370, subd. (a)(1)(B)(i).)[3]  Once the order is entered, the committing county is required to provide the Department documents relevant to the upcoming admission that are specified by statute, including copies of the commitment order, criminal history information, arrest reports, psychiatric examination reports, and medical records.  (*Id.*, § 1370, subd. (a)(3); Cal. Code Regs., tit. 9, §§ 4711, 4712.)  The Department must receive these documents prior to the defendant's admission to a DSH facility.  (Pen. Code, § 1370, subd. (a)(3); Cal. Code Regs., tit. 9, § 4716, subd. (a); see *In re Loveton* (2016) 244 Cal.App.4th 1025, 1030; Welf. & Inst. Code, § 7228.)

The Department reviews these documents to evaluate each IST defendant's appropriate placement, which includes assessing the IST defendant's security risk as only Atascadero and Patton accept patients posing a high security risk.  (See Pen. Code, § 1370, subd. (a)(2)(A); Welf. & Inst. Code, §§ 7228, 7230; Cal. Code Regs., tit. 9, §§ 4714, 4715.)  To determine an individual's security risk, the Department must consider several factors, including any new or additional information the Department

---

[3]     A court also may commit an individual to other facilities, including community-based residential treatment programs with a secured perimeter, or to outpatient status.  (See, e.g., Pen. Code, § 1370, subd. (a)(1)(B)(i).)

receives within 30 days prior to completion of the security risk assessment. (Cal. Code Regs., tit. 9, § 4714, subd. (b)(2).) The Department also must assess an IST defendant's medical needs to determine the appropriate facility for admission. (Welf. & Inst. Code, § 7228; Cal. Code Regs., tit. 9, § 4713.)

The Department admits IST defendants to a DSH facility according to the date the court committed each defendant to the Department. (Cal. Code Regs., tit. 9, § 4710, subd. (a).) The actual admission date may change depending on certain factors, including bed availability at the facility being considered for placement and whether the IST defendant exhibits psychiatric acuity which may indicate the need for admission notwithstanding the defendant's commitment date. (*Ibid.*)[4]

The statutes do not set a deadline for admission of an IST defendant to the Department after issuance of a commitment order. (*People v. Aguirre* (2021) 64 Cal.App.5th 652, 656 (*Aguirre*).) However, the Department is required to report "the defendant's progress toward recovery of mental competence" within 90 days of the court's commitment order. (Pen. Code, § 1370, subd. (b)(1); *In re Chunn* (2022) 86 Cal.App.5th 639, 646 (*Chunn*).) "Appellate courts have held an IST defendant must be admitted in sufficient time to allow DSH to make this required report." (*People v. Edwards* (2023) 88 Cal.App.5th 1259, 1264 (*Edwards*).) To comply with the statutory scheme, " 'the defendant must be delivered to the hospital, the hospital must examine the defendant and provide the defendant with treatment that will promote speedy restoration

---

**4** An IST defendant may be admitted notwithstanding the court's commitment date if the Department determines an individual has psychiatrically acute symptoms, meaning the "individual's mental illness is causing complications which put the individual at risk of death or serious injury while awaiting admission." (Cal. Code Regs., tit. 9, §§ 4700, subd. (c), 4717, subd. (a).) The committing county must contact the Department to request a physical acuity review and provide documentation supporting psychiatric acuity. Once the Department receives the documentation, it has three business days to determine whether the IST defendant meets the criteria for immediate admission for treatment. (*Id.*, § 4717, subds. (b), (c) & (e).)

to competence, and the hospital's medical director must document the defendant's progress in a report to the court.  ([Pen. Code,] § 1370.)  For all of this to occur, a defendant needs sufficient time at the state mental hospital to be duly evaluated, potentially to derive some benefit from the prescribed treatment, and for such progress to be reported to the court.' " (*Ibid.*, quoting *In re Mille* (2010) 182 Cal.App.4th 635, 650.)

"If the 90-day report indicates that the defendant has been restored to competency or is unlikely to regain mental competence in the foreseeable future, the defendant must be returned to the court no later than 10 days after receipt of the report." (*Chunn*, *supra,* 86 Cal.App.5th at pp. 646–647, citing Pen. Code, §§ 1370, subd. (b)(1)(A), 1372, subd. (a)(3)(C).)  The underlying criminal proceeding is suspended until the court declares the defendant restored to competency.  (Pen. Code, § 1370, subd. (a)(1).)  "Defendants may not be confined as an IST for more than two years, or longer than the maximum sentence for the most serious offense charged, whichever is shorter." (*Chunn*, at p. 647, citing Pen. Code, § 1370, subd. (c)(1).)

In 2021, the Legislature amended section 1370, effective July 27, 2021, "to allow DSH to conduct evaluations of IST defendants in county custody, pursuant to newly added Welfare and Institutions Code section 4335.2, to determine whether a defendant has (1) regained competence, (2) is unlikely to regain competence in the foreseeable future, or (3) should be referred for a county diversion program or an outpatient program." (*Chunn*, *supra*, 86 Cal.App.5th at p. 647, citing Pen. Code, § 1370, subd. (a)(1)(H)(i), as amended by Stats. 2021, ch. 143, § 343.)

Welfare and Institutions Code section 4335.2 "established a program for DSH to perform 'reevaluations' of IST defendants, primarily through telehealth evaluations," and, as originally enacted, "provided that such evaluations were intended for IST defendants 'who have been waiting for admission to [DSH] 60 days or more from the date of commitment.' " (*Chunn*, *supra*, 86 Cal.App.5th at p. 647, citing Stats. 2021,

ch. 143, § 351.)[5] "The statute expressly stated that '[b]eginning July 1, 2021, the department, or its designee, shall have the authority and sole discretion to consider and conduct reevaluations for IST defendants committed to and awaiting admission to the department for 60 days or more,' " and gave the Department sole discretion to " 'conduct in person, or video telehealth, evaluations of IST defendants at the local jail for those IST patients awaiting admission more than 60 days since their commitment to the department.' " (*Chunn*, at p. 647, citing Stats. 2021, ch. 143, § 351.) In 2022, the Legislature amended Welfare and Institutions Code section 4335.2, effective June 30, 2022, "to eliminate the requirement that the department only serve defendants who have been waiting 60 days or more for admission." (*Chunn*, at p. 647 & fn. 4, citing Welf. & Inst. Code, § 4335.2, subd. (b), as amended by Stats. 2022, ch. 47, § 53.)

IST defendants have constitutional due process liberty interests under both the federal and California Constitutions, which means they " 'cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he [or she] will attain that capacity in the foreseeable future.' " (*Chunn*, *supra*, 86 Cal.App.5th at p. 654.) As the court recognized in *Chunn*, "[f]or more than a decade now, California courts have wrestled with the problem of timely hospital admissions for IST defendants once they have been ordered committed because the number of IST defendants has outstripped space available for treatment in DSH facilities.

---

[5] The legislation also added section 4147 to the Welfare and Institutions Code, which requires the California Health and Human Services Agency along with the Department to "convene an Incompetent to Stand Trial Solutions Workgroup" comprised of members of relevant state agencies, the Judicial Council, and other partners, including local government and justice system representatives and representatives of patients and their family members, to "confront the crisis of individuals found" IST and the importance of "receiving competency treatment as soon as practicable." (Stats. 2021 ch. 143, § 350.) The workgroup is required to submit short-, medium-, and long-term solutions to support the Department "in serving individuals with the most intensive behavioral health treatment needs and providing timely access to treatment for individuals found IST on felony charges." (Welf. & Inst. Code, § 4147, subd. (c).)

[Citation.] IST defendants subjected to lengthy wait times have sought and obtained relief in various forms, resulting in a patchwork if decisional law governing the reasonable admission deadlines to treatment facilities and consequences for failure to meet them." (*Id.* at pp. 654–655, fn. omitted.)

In *Stiavetti v. Clendenin* (2021) 65 Cal.App.5th 691, Division Two of the First District Court of Appeal affirmed a trial court's imposition of a statewide deadline requiring the Department to "commence substantive competency services for IST defendants within 28 days of service of the order transferring responsibility to DSH," which reflects "the maximum constitutionally permissible delay in commencing substantive services." (*Id.* at pp. 727, 730.) The appellate court concluded the Department had "systematically violated the due process rights of all IST defendants in California by failing to commence substantive services designed to return those defendants to competency within 28 days of service of the transfer of responsibility document, which is the date of service of the commitment packet for all defendants committed to DSH." (*Id.* at p. 695.)[6]

## B.    *Factual and Procedural Background*

### 1.    The Commitment Order

On January 11, 2021, D.H.'s counsel declared doubt as to D.H.'s competency pursuant to Penal Code section 1368 in the matter of *People v. D.H.*, Tuolumne County

---

[6]    The trial court's order granting the petition for writ of mandate and judgment in *Stiavetti v. Clendenin* were issued in April 2019, while the appellate opinion partially affirming the judgment was filed on June 15, 2021. (*Stiavetti v. Clendenin*, *supra*, 65 Cal.App.5th at p. 705.) On January 24, 2022, the *Stiavetti v. Clendenin* trial court issued a writ of mandate ordering the Department to phase in the requirement to commence substantive services for all IST defendants within 28 days from the transfer of responsibility date over 30 months from August 27, 2021 as follows: (1) within 12 months, commence substantive services within 60 days; (2) within 18 months, commence substantive services within 45 days; (3) within 24 months, commence substantive services within 33 days; and (4) within 30 months, commence substantive services within 28 days.

Superior Court case No. CRF62716. The same declaration was made around the same time in 10 other criminal cases pending against D.H. in Tuolumne County Superior Court.[7] In May 2021, the trial court found D.H. was mentally incompetent pursuant to Penal Code section 1368.

A hearing was held on June 21, 2021, in case No. CRF62716, to receive the report of the regional center director. The trial court ordered D.H. committed to the Department for placement until his mental competency was restored. The minute order states that the medical director of the state hospital or other treatment facility must file a written report to the court and regional center director within 90 days of commitment.

On June 29, 2021, the trial court issued a single "ORDER SUSPENDING TRIAL AND COMMITTING MENTAL INCOMPETENT," which listed the 11 cases pending against D.H. in the caption. The order stated D.H. had been found mentally incompetent within the meaning of Penal Code section 1368 and ordered, among other things, that the criminal proceedings against D.H. be suspended, the Sheriff of Tuolumne County deliver D.H. to the Department at a DSH facility pursuant to Penal Code section 1370, and the order and other listed documents be forwarded to the Department. The order further stated the court found the maximum term of imprisonment for the most serious offense charged in the complaint is 10 years and the maximum period of commitment to the DSH is two years. D.H. was given a total of 1,121 days credit for time served, to be deducted from the maximum term of commitment.

The Department received D.H.'s commitment packet on July 21, 2021, but it did not include jail medical records. The Department received the jail medical records on July 23, 2021, at which time the commitment packet was complete.

---

[7] Those cases are Tuolumne County Superior Court case Nos. CRF65139, CRM61668, CRM61727, CRM61768, CRM61822, CRM61837, CRM61838, CRM61840, CRM61857, and CRM61978.

### 2. The Order to Show Cause

On October 5, 2021, the trial court sua sponte issued an order to show cause (OSC) as to why sanctions should not be imposed on the Department for its failure to admit D.H. to a state hospital pursuant to the provisions of Penal Code section 1370. The OSC stated: on January 11, 2021, the court issued an order finding "the defendant in the above entitled matter to be incompetent to stand trial pursuant to Penal Code section 1368"; on June 21, 2021, the court issued an order committing D.H. to the Department for competency training; D.H. was remanded to custody to await transportation to the Department; D.H. had remained in local custody without the provision of any mental health services to address the incompetency finding; and despite numerous inquiries the only information the Department provided was that D.H. was on a facility waitlist with no time estimate given for admission. The caption identified the 11 cases pending against D.H. by case number.

The Department filed a response to the OSC on November 4, 2021.[8] The Department argued the OSC should be vacated given the Covid-19 public health crisis as any sanction or admission order would require the Department to disregard its duties to its patients, jeopardize patient safety, and repudiate expert guidance and executive direction. The Department further argued any sanctions order would require it to violate regulations that govern admissions, and there was no showing it was able to comply with the commitment order or its actions were sanctionable or contemptuous.

The declarations submitted with the response showed that since fiscal year 2013-2014, the referral and admission rate of IST defendants committed to the Department had increased substantially. The Department was receiving more orders to treat patients than

---

[8] The response consisted of a legal brief and supporting declarations of the Department Assistant Deputy Director of Hospital Strategic Planning and Implementation Dennalee Folks, with attached exhibits, and Forensic Services Division consulting psychologist Tracy Weyer.

beds were being vacated, creating a waitlist. The Department addressed this ongoing increase by maintaining its patient census at its maximum licensing, functional, or statutory capacity (excluding units in the activation process) with a resulting waitlist.

The Department asserted it had taken measures to increase its capacity to provide care to IST defendants, as it could provide restorative care in a variety of settings that it either operates or funds, including: (1) four state hospitals (DSH-Napa, DSH-Metropolitan, DSH-Atascadero, and DSH-Patton); (2) 16 jail-based competency treatment programs (JBCT); (3) the Admission, Evaluation and Stabilization Center (AES) in Kern County; and (4) the Los Angeles County Community Based Restoration program. As a result of its efforts from fiscal year 2012-2013 through fiscal year 2020-2021, the Department had activated 528 additional hospital beds and increased its AES Center and JBCT combined capacity to 427 beds, for a total net increase of 955 beds.

The Department had been working to improve the efficacy of its treatment so IST defendants could be certified as competent and returned to court as soon as possible. The Department's Patient Management Unit served as a centralized office for receiving commitment orders and packets for IST patients referred from 58 counties and determining the admission of such patients to the Department's inpatient beds. The Department placed IST defendants on a DSH facility waitlist, so IST defendants are admitted based on the date of commitment. As of October 25, 2021, the IST waitlist for admission to a state hospital, a JBCT program, or the AES Center was 1,733. The Calaveras JBCT program was at full capacity for IST defendants and D.H. was number 11 on the waitlist. The Department was unable to provide an estimated date of admission due to the Covid-19 pandemic's impact on admissions to DSH facilities statewide.

The Department asserted the delay in D.H.'s case necessarily flowed from the Governor's use of the Emergency Services Act. Executive Order N-35-20, which the Governor issued on March 21, 2020, authorized the Director of the Department to issue directives waiving any provision or requirement of the Penal Code that affects the

10.

execution of laws relating to care, custody, and treatment of persons with mental illness committed to or in the custody of the Department, and accompanying regulations in title 9, division 1 of the California Code of Regulations.

In response, the Department acted to prevent the spread of Covid-19 among patients and staff. The Department initiated its first 30-day suspension of the admission or discharge of six of seven categories of patients, including those committed as IST defendants on March 23, 2020, which it extended for an additional 30 days on April 22, 2020.[9] The Department resumed IST admissions in May 2020, after establishing policies in consultation with public health experts, to address the risk of Covid-19 transmission, including not admitting Covid-positive or Covid-exposed individuals and admitting patients in cohorts on a weekly basis.

When Covid-19 cases surged several months later, the Department suspended the admission of certain patient categories, including IST defendants, effective January 12, 2021, which was necessary to ensure patients continued to receive services and support that were threatened by disruptions caused by Covid-19 and to protect their health, safety, and welfare. A month later, the Department issued notices of the resumption of admissions at certain facilities, including DSH-Napa (effective Feb. 1, 2021), DSH-Metropolitan (effective Feb. 3, 2021), and DSH-Atascadero (effective Feb. 8, 2021).

The Department's implementation of its Covid-19 policies resulted in an increased waitlist for admission. The Department reduced its census to establish isolation and quarantine space within its hospitals so it could safely resume patient admissions during the pandemic. As admissions resumed, admission rates became dependent on each facility's ability to screen, test, quarantine, and observe cohorts of patients before they can be transferred to a treatment program. In addition, Covid-19 transmission within the

---

[9]     For those patients that the Department did not have the authority to suspend admission, the Department provided specialized Covid-19 screening.

11.

facilities could impact admission rates due to the required quarantining of any impacted units and the need to do contact tracing and testing.

At the November 4, 2021 OSC hearing, the Department's attorney told the trial court that D.H. had moved up to number nine on the waitlist with an estimated date of admission in mid- to late-December.[10]  The trial court noted it was the Department's obligation to provide care to help restore people to competency to stand trial.  While the trial court recognized the Department claimed it was doing the best it could, the emergency order authorized it to reduce the population in DSH facilities and suspend admissions, and as congregate facilities, the hospitals were susceptible to spreading Covid-19, it noted county jail inmates were in a worse position for spreading Covid-19 as they were housed in dormitory style rooms.  The trial court further noted the IST defendants were receiving "zero mental health care" while their "mental health condition deteriorates."

The trial court believed the Department was obligated to come up with a solution rather than claim nothing could be done, and its position was unfair since Tuolumne County did not have the same access to mental health treatment for IST defendants awaiting DSH admission that other counties had, and the pandemic was also a problem for county jail inmates.  While the Department's attorney argued the pandemic constituted extenuating circumstances justifying the delay, the trial court noted the jail had the same extenuating circumstances and questioned how the Department got to say, "We don't have to do our job.  We're going to make other people take care of the people that we're supposed to take care of."  The trial court rejected the Department's position and stated it was going to sanction the Department $5,000.  The Department's attorney

---

[10]     The Department filed a status update that confirmed this information and noted the DSH was operating at full capacity on IST beds.

asked if that would be in written form. The trial court responded it was not obligated to do it in written form.

The trial court took a recess and then returned to address the Department's request for further clarification regarding the sanctions. The trial court stated it was sanctioning the Department under section 177.5 because the Department is a real party in interest and witness within the meaning of section 177.5 and it violated the order without good cause or substantial justification. The trial court stated in imposing sanctions, it was relying on the cases of *Aguirre*, *supra*, 64 Cal.App.5th 652, *People v. Hooper* (2019) 40 Cal.App.5th 685 (*Hooper*), and *People v. Kareem A.* (2020) 46 Cal.App.5th 58 (*Kareem A.*).

The trial court stated it did not accept the Department's assertion of good cause and substantial justification for the reasons "outlined in my prior discussion during the oral argument" and it rejected the Department's argument it could not comply with the court's order due to the pandemic "for the reasons previously outlined." The trial court found the Department "repeatedly violated due process rights of the mentally ill in this county by denying the adequate resources necessary to comply with Penal Code section 1370" and rejected the Department's contentions that its "inability to meet the needs" and its efforts to solve the waitlist problem constituted good cause or substantial justification. The trial court acknowledged the Covid pandemic had made the delays in admission but noted it had made things worse for everyone involved in the system and was not an excuse for not complying with due process rights. The trial court added that even in the height of the pandemic, the courts did everything possible to ensure people's rights to a speedy trial and due process were satisfied, and the courts "didn't just shrug our shoulders as the state hospital system is doing, saying, [i]t is not our problem, we can't do anything about it."

The initial minute order for the hearing, which listed only case No. CRF62716 in the caption, stated the trial court found sanctions were appropriate under section 177.5,

13.

and ordered "[s]anctions in the amount of $5000.00 to be paid by The Department of State Hospitals no later than 12/6/2021." The trial court issued an amended minute order which listed the same single case number in the caption, but which added to the sanctions order the statement that the order encompassed all 11 cases, which were listed by case number.

On November 23, 2021, the trial court issued an ex parte order modifying the sanctions order. The ex parte order stated that at the conclusion of the November 4, 2021 OSC hearing the court ordered the Department to "pay sanctions in the amount of $5,000.00 under Code of Civil Procedure section 177.5 for the reasons stated on the record," and the court wanted to clarify and modify the sanction award. The ex parte order further stated: "The Order dated June 29, 2021, directing DHS to fulfill its statutory duty to treat the defendant herein applied to eleven (11) specific cases, all included on one Order for convenience purposes only. The Order constitutes eleven (11) Orders; DHS's failure to comply with each Order constitutes eleven (11) violations of this Court's Orders. The Court found, and continues to find, that DHS failed to comply with each Order and did so without good cause and without substantial justification. Code of Civil Procedure section 177.5 allows courts to sanction a real party in interest up to $1,500 for each violation of its orders." The trial court therefore vacated the prior order imposing $5,000 in sanctions, and instead ordered the Department to pay sanctions of $1,500 for each of the 11 orders issued on June 29, 2021, for a total sanction award of $16,500, to be paid by the original deadline of December 6, 2021.[11]

---

[11] The appellate record contains a reporter's transcript of a December 23, 2021 hearing, which took place after the notice of appeal was filed. At that hearing, a DSH representative informed the trial court D.H. was on a waitlist for admission to Atascadero State Hospital with an estimated admission date of January 5, 2022.

14.

## DISCUSSION

### *The Motion to Dismiss*

As a threshold matter, we address D.H.'s motion to dismiss the appeal on the ground the sanctions order is not appealable. D.H. contends because the order is a judgment of contempt and the Department is not a party to the criminal case or competency proceedings, the order is not appealable but rather is reviewable by a petition for writ of mandate.

It is true that orders in contempt cases are final and conclusive and are not appealable. (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 367; §§ 904.1, subd. (a)(1), 1222.) Instead, review of a contempt finding is available by writ. (*Van v. LanguageLine Solutions* (2017) 8 Cal.App.5th 73, 79.) But this is not an appeal from a contempt finding, but rather from an order imposing sanctions pursuant to section 177.5 Although the trial court did not specify the source of its proposed sanctions in the OSC, at the OSC hearing, the trial court stated it was sanctioning the Department under section 177.5 because it was a real party in interest and a witness within the meaning of the statute. Moreover, the minute order for the hearing and the ex parte order both state sanctions were being imposed under section 177.5.

An order imposing sanctions pursuant to section 177.5 is appealable as a final order on a collateral matter directing the payment of money. (*Caldwell v. Samuels Jewelers* (1990) 222 Cal.App.3d 970, 975–976; accord, *Bauguess v. Paine* (1978) 22 Cal.3d 626, 634, fn. 3; *Kibrej v. Fisher* (1983) 148 Cal.App.3d 1113, 1115; *Wisniewski v. Clary* (1975) 46 Cal.App.3d 499, 502.) Although the Department was not a party to the underlying action, it is a party of record in the collateral matter by virtue of the trial court's order and consequently has standing to appeal. (*Caldwell v. Samuels Jewelers*, *supra*, 222 Cal.App.3d at p. 976, citing *Ellis v. Roshei Corp.* (1983) 143 Cal.App.3d 642, 645, fn. 3.)

D.H. argues the Department could not be sanctioned under section 177.5 because it is neither a party nor a witness to the underlying proceedings. This contention was rejected in *Aguirre*, *supra*, 64 Cal.App.5th at p. 659, *Kareem A.*, *supra*, 46 Cal.App.5th at pp. 70–74, and *Hooper*, *supra*, 40 Cal.App.5th at pp. 692–694. While section 177.5 states that sanctions may be imposed "for any violation of a lawful court order by a person" and states "the term 'person' includes a witness, a party, a party's attorney, or both," these cases hold that list is not exclusive and merely provides guidance as to who may be considered a person, and therefore may apply to nonparties who become directly involved in the action, such as the Department. (*Aguirre*, at pp. 659, 667–668; *Kareem A.*, at pp. 70, 74; *Hooper*, at pp. 692–694.) We see no reason to depart from these decisions.

Since the sanctions order is appealable, we deny D.H.'s motion to dismiss.

***Standard of Review***

"We review orders imposing sanctions for abuse of discretion. [Citation.] The trial court must exercise its discretion in a 'reasonable manner with one of the statutorily authorized purposes in mind and must be guided by existing legal standards.' [Citation.] A mere difference of opinion between the appellate and trial courts is insufficient to warrant reversal. [Citation.] Questions of law, on the other hand, are subject to de novo review. [Citation.] When a trial court relies on a statute as authority to award sanctions, we review the interpretation of the statute de novo." (*Hooper*, *supra*, 40 Cal.App.5th at pp. 691–692.)

***Code of Civil Procedure Section 177.5***

Section 177.5 provides: "A judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), … payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification…. [¶] Sanctions pursuant to this section shall not be imposed except on notice contained in a party's moving or responding papers; or on the court's

16.

own motion, after notice and opportunity to be heard.  An order imposing sanctions shall be in writing and shall recite in detail the conduct or circumstances justifying the order." (§ 177.5.)  The purpose of section 177.5 " 'is to punish and deter violations of lawful court orders [citation], and to compensate the judicial system for the cost of unnecessary hearings.' "  (*Edwards*, *supra*, 88 Cal.App.5th at p. 1267.)

### *The Order Does Not Recite the Circumstances Justifying Sanctions*

The parties agree reversal is required because the trial court's written order does not comply with section 177.5's requirement that "[a]n order imposing sanctions shall be in writing and shall recite in detail the conduct or circumstances justifying the order." (§ 177.5.)  We also agree the order is deficient.

The trial court's November 23, 2021 ex parte order modifying the sanctions order, states that at the conclusion of the November 4, 2021 OSC hearing, "this Court ordered that DSH pay sanctions in the amount of $5,000.00 under Code of Civil Procedure section 177.5 for the reasons stated on the record."  The ex parte order goes on to state that "[t]he Court found, and continues to find, that DHS failed to comply with each Order and did so without good cause and without substantial justification."

The ex parte order does not "recite in detail the conduct or circumstances justifying the order."  (§ 177.5.)  While the trial court made a detailed oral statement justifying the sanctions, we cannot uphold its order in the absence of a proper writing. "A trial judge's on-the-record oral recitation of reasons for imposing sanctions is insufficient."  (*Childs v. PaineWebber Incorporated* (1994) 29 Cal.App.4th 982, 996; accord, *Edwards*, *supra*, 88 Cal.App.5th at p. 1273 [order insufficient because it did not contain a detailed explanation of the trial court's finding the Department lacked good cause or substantial justification for its failure to admit the defendant by the court-ordered deadline]; *West Coast Development v. Reed* (1992) 2 Cal.App.4th 693, 705.)  While the ex parte order referred to the "reasons stated on the record" to justify the sanctions, the record was not attached to the ex parte order.

17.

" 'Having failed to make findings, the trial court is not deprived of this opportunity forever. [¶] We remand so that the trial court may either make findings in a manner consistent with the views expressed in this opinion, or in the alternative, vacate its award of [sanctions].' " (*Edwards*, *supra*, 88 Cal.App.5th at p. 1273; see *People v. Ward* (2009) 173 Cal.App.4th 1518, 1531 [reversing sanctions order that did not contain requisite details and remanding " 'so the trial court can enter a proper sanctions order' "].)

***The Sanctions Amount***

The parties also agree the trial court erred as a matter of law when it issued $16,500 in sanctions, which represented $1,500 for each of D.H.'s 11 pending criminal cases. The Department asserts sanctions under section 177.5 for failing to comply with a commitment order are limited to $1,500 for any violation of a court order and here there was at best a single violation. We agree.

Our fundamental task in interpreting a statute " ' " ' "is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' [Citation.] If the language of the statute is clear and unambiguous, there is no need for judicial construction and our task is at an end. If the language is reasonably susceptible of more than one meaning, however, we may examine extrinsic aids such as the apparent purpose of the statute, the legislative history, the canons of statutory construction, and public policy." (*Chunn*, *supra*, 86 Cal.App.5th at p. 669.)

Section 177.5 states: "A judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification." On its face, the statute limits sanctions to a maximum of $1,500 for a violation of a lawful court order.

18.

In *Chunn*, the trial court issued a county-wide standing order that authorized the imposition of monetary sanctions of up to $1,500 per day against the Department for noncompliance with commitment orders, as it deemed "each 24-hour period of non-compliance a new, separate and distinct violation of its orders for purposes of imposing sanctions under [] section 177.5." (*Chunn*, *supra*, 86 Cal.App.5th at p. 653.) The appellate court reversed as: (1) the plain language of section 177.5 limits a sanctions award to $1,500 and does not refer "to successive, per-day sanctions or state whether each day of noncompliance of a court order would allow for a separate violation within the meaning of the statute"; (2) other appellate cases noted sanctions were limited to $1,500; and (3) "the legislative history suggests that the Legislature intended to strictly limit the amount of sanctions permitted under the statute to $1,500."[12] (*Chunn*, at pp. 670–671.) Based on the foregoing, the appellate court concluded the trial court's order must be modified to limit sanctions under section 177.5 to $1,500 per defendant, not $1,500 per day. (*Chunn*, at p. 671.)

In *Edwards*, the appellate court considered whether the trial court could impose sanctions for each day the IST defendant was not admitted to DSH beyond the court's deadline. (*Edwards*, *supra*, 88 Cal.App.5th at p. 1275.) The appellate court presumed, by comparing section 177.5 to the statutes governing contempt, sections 1209 and 1218, and the cases interpreting those sections, that "the Legislature intended to limit sanctions under section 177.5 to $1,500, unless separate violations of a court order are committed, in which case the violator could be fined up to $1,500 for each separate violation."

---

[12] The appellate court noted the original draft of the bill did not limit the amount a court could order, but a later amendment included the $1,500 limit. (*Chunn*, *supra*, 86 Cal.App.5th at pp. 670–671.) Moreover, while a Senate Judiciary Committee report referred to per-day contempt sanctions when discussing existing options for enforcement of courtroom rules, the report did not indicate section 177.5 was to operate in a similar fashion but rather repeatedly referenced the proposed statute's plain language, noting that sanctions would be permissible "up to $1,500." (*Chunn*, at p. 671.)

19.

(*Edwards*, at p. 1277.) Although the trial court imposed daily sanctions, it did not make any findings on whether the Department committed separate violations of a court order on each day beyond the court's deadline to admit a defendant to DSH. Accordingly, the appellate court remanded the case to the trial court to make such findings. (*Ibid.*)

While the appellate court in *Edwards* agreed with *In re Chunn* that section 177.5's legislative history demonstrates the Legislature intended to limit sanctions to $1,500, the *Edwards* court concluded "neither the legislative history nor the language of section 177.5 expressly addresses whether multiple sanctions of up to $1,500 may be imposed for separate violations of a court order." (*Edwards*, *supra*, 88 Cal.App.5th at p. 1279.) Accordingly, the *Edwards* court did not foreclose the imposition of daily sanctions, but rather concluded that "[b]ecause a court may impose separate fines up to the statutory maximum for separate acts of contempt, … section 177.5 authorizes a court to impose separate sanctions up to the statutory maximum of $1,500 for separate violations of a lawful court order." (*Id.* at p. 1278.)

We need not decide whether a court may impose daily sanctions that exceed the $1,500 threshold, as that is not what occurred here. In this case, there was one court order which suspended the criminal proceedings in the 11 cases pending against D.H. and ordered him to be delivered to the Department. The trial court, however, stated in the ex parte order that it issued one commitment order "for convenience purposes only" and there actually were 11 orders—one for each of the pending criminal cases. The trial court reasoned that since there were 11 orders, by failing to fulfill its statutory duty to treat D.H., the Department violated 11 court orders, which justified imposing $1,500 in sanctions in each of the 11 cases.

Using the rationale used in *Edwards*, the issue is whether the Department's failure to admit D.H. constituted 11 separate violations of a court order. Contempt cases instruct that "[w]here separate contemptuous acts are committed, the contemnor can be fined for each offense …." (*Donovan v. Superior Court* (1952) 39 Cal.2d 848, 855), and the

20.

" 'crucial question' in determining whether separate adjudications of contempt are proper is whether these separate adjudications 'were based upon separate insults to the authority of the court, not whether the insults happened to occur on the same or different days.' " (*Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 787.)

Looking to other contempt cases for guidance on applying this rule, separate contempts were appropriately found where there were multiple violations that were discrete and separated in time from prior violations, or were distinct from each other. (*Moore v. Superior Court* (2020) 57 Cal.App.5th 441, 462–463, citing *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1248 and *Donovan v. Superior Court*, *supra*, 39 Cal.2d at pp. 850–851, 854–855.) In contrast, multiple punishment was prohibited where a witness refused to answer a series of related questions at a single hearing, a party refused to abide by an order to return documents for 38 straight days, or an attorney continually failed to pay a single discovery sanction. (*Moore v. Superior Court*, at pp. 462–463, citing *In re Keller* (1975) 49 Cal.App.3d 663, 667–669, *Conn v. Superior Court*, *supra*, 196 Cal.App.3d at p. 777, and *Koehler v. Superior Court* (2010) 181 Cal.App.4th 1153, 1169–1170.)

We find the circumstances here to be more like the latter cases than the former. While there were 11 court orders, they could only be violated once—when the Department failed to treat D.H. Even if there were 11 orders, the Department could only comply with the orders by engaging in the same act—admitting D.H. for treatment. The failure to admit D.H. was one insult to the court's authority, not separate insults based on the number of cases pending against him. In this circumstance, imposing multiple $1,500 sanctions for a single failure to act would result in imposing sanctions over the $1,500 limit. (*Hooper*, *supra*, 40 Cal.App.5th at p. 695 [the sanction amount under § 177.5 must be reasonable and within the $1,500 statutory limit].)

While we appreciate the trial court's apparent frustration, imposing $1,500 for each criminal case exceeds the $1,500 limit; moreover, it is not reasonable to impose

21.

multiple sanctions for the same violative act. Thus, where the Department violates a commitment order for a defendant who has multiple criminal cases pending against him or her, its sanctions are limited to $1,500 per defendant, not $1,500 per case. As the Department asserts, to hold otherwise would result in "inequitable and nonsensical consequences," as "the sanctions cap would not be connected to or limited by the conduct of the party violating the court's order, but instead would fluctuate—potentially quite significantly—based entirely on the number of underlying criminal cases that happen to be pending against the defendant." Thus, the Department could be sanctioned in different amounts depending on whether a defendant has one or more than one pending case. Essentially, the Department would be punished multiple times for the same act.

In sum, the trial court's conclusion that section 177.5's $1,500 sanctions cap may be circumvented by simply multiplying the cap times the number of pending criminal cases subject to an IST commitment order is not supported by the statute and leads to unfair and nonsensical results. Accordingly, the trial court's imposition of $16,500 in sanctions was improper as a matter of law and must be reversed.[13]

***The Department's Good Cause Showing***

As for the Department's argument that it had good cause or substantial justification for failing to comply with the trial court's commitment order, the parties agree we need not decide this issue if we conclude remand is required based on the trial court's failure to provide a detailed written recitation of the conduct or circumstances justifying the sanctions order and its imposition of sanctions exceeding $1,500. Since

---

[13] The parties question whether the nine misdemeanor cases may even be considered in imposing sanctions. As the Department points out, Penal Code section 1370.01, which applies to misdemeanor cases (Pen. Code, § 1367, subd. (b)), does not permit the trial court to commit a defendant charged with misdemeanors to the Department. And D.H. asserts that given his precommitment custody credits, he may not be committed for any period of time in the misdemeanor cases. Given our disposition, we do not decide the issue, which was not raised in the trial court.

22.

remand is required on these grounds, we do not reach the issue of good cause. Instead, we leave it to the trial court to either make findings consistent with the views expressed herein or, in the alternative, to vacate its sanctions award.

## **DISPOSITION**

The order imposing sanctions is reversed, and the matter is remanded to the trial court with directions to either make sufficient findings to support the imposition of sanctions and to reimpose a maximum amount of $1,500 in sanctions, or to vacate or reduce its award of sanctions.


DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.

23.